UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SERKAN CABI, PH.D., ISIN CAKIR, PH.D., and SAFAK MERT, PH.D. ) | Civil Action No.: 1:15-cv-12306 |
| Plaintiffs ) | |
| v. ) | |
| BOSTON CHILDREN'S HOSPITAL, THE CHILDREN'S HOSPITAL CORPORATION AND ITS AFFILIATED ENTITIES, UMUT OZCAN, M.D., JOSEPH MAZJOUB, M.D., and ERX PHARMACEUTICALS, INC., ) | |
| Defendants ) | |

**COMPLAINT AND JURY CLAIM**

1.     The Plaintiffs, Serkan Cabi, Ph.D. ("Dr. Cabi"), Isin Cakir, Ph.D. ("Dr. Cakir"), and Safak Mert, Ph.D. ("Dr. Mert"), by and through their undersigned counsel, file this Complaint against the Defendants and allege the following:

**PARTIES**

2.     Boston Children's Hospital ("Children's Hospital") is a pediatric hospital and research center with its main campus at 300 Longwood Avenue, Boston, Massachusetts 02115. By its definition, and for the purposes of this lawsuit, Children's Hospital includes The Children's Hospital Corporation and its affiliated entities including The Children's Medical Center Corporation, Fenmore Realty Corporation, Longwood Research Institute, Inc., 333 Limited Partnership, CHB Properties, Inc. and Longwood Corporation.

3.     Children's Hospital is a teaching affiliate of Harvard Medical School and it employs more than fifteen persons.

4.     Dr. Umut Ozcan, M.D. ("Dr. Ozcan") supervises a research laboratory at Children's Hospital where he conducts research and advises post-doctoral fellows and research assistants who work with him.

5.     Dr. Ozcan is a Principal Investigator at Children's Hospital and an associate professor at Harvard Medical School.

6.     Dr. Ozcan is a supervisor at Children's Hospital.

7.     Some of the research performed in Dr. Ozcan's laboratory is funded by National Institute of Health ("NIH") federal grant money. NIH grant money also provides some of the funding for paying

1

research assistants and post-doctoral fellows in Dr. Ozcan's laboratory. See Exhibit A.

8.     Children's Hospital is also a source of funding for research and salary in Dr. Ozcan's laboratory. Children's Hospital receives funding from private and public sources, including but not limited to federal programs such as the NIH.

9.     The American Diabetes Association ("ADA") is or was also a source of funding for research and salary in Dr. Ozcan's laboratory.

10.     Dr. Ozcan is also a director at ERX Pharmaceuticals, Inc. ("ERX"), a duly organized Delaware corporation with a registered agent, K. Teoman Uysal, 15 Trowbridge Street, Apartment 2, Cambridge MA 02136. See Exhibit B.

11.     Through ERX, Dr. Ozcan hopes to market the results of certain research performed at his laboratory.

12.     Dr. Joseph Majzoub, M.D. ("Dr. Majzoub") is Dr. Ozcan's division chief at Children's Hospital.

13.     Dr. Majzoub also has an interest in ERX.

14.     Dr. Cabi started work at Children's Hospital in the laboratory of Dr. Ozcan in June 2009 as a post-doctoral fellow. Dr. Cabi currently resides in Brighton, Massachusetts.

15.     Dr. Cakir started work at Children's Hospital in the laboratory of Dr. Ozcan in October 2010 as a post-doctoral fellow. Dr. Cakir currently resides in Nashville, Tennessee.

16.     Dr. Mert started work at Children's Hospital in the laboratory of Dr. Ozcan in April 2012 as a research assistant and he then was promoted to post-doctoral fellow in February 2014. Dr. Mert currently resides in Brighton, Massachusetts.

17.     As of June 19, 2014, Dr. Cabi, Dr. Cakir, and Dr. Mert were no longer working in Dr. Ozcan's laboratory pursuant to a letter from Children's Hospital to each of them.

## JURISDICTION

18.     Jurisdiction is proper under 28 U.S.C. § 1331, 28 U.S.C. § 1343, and 28 U.S.C. § 1367.

19.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b) and the Local Rules of the United States District Court for the District of Massachusetts.

20.     On or about December 29, 2014, Dr. Cabi, Dr. Cakir, and Dr. Mert filed charges with the Massachusetts Commission Against Discrimination and the Equal Employment Opportunity Commission (the "MCAD Complaints"). See Exhibit C

21.     Dr. Cabi, Dr. Cakir, and Dr. Mert hereby exercise their right to remove the claims in the MCAD Complaints to this Court for adjudication. Dr. Cabi, Dr. Cakir, and Dr. Mert have closed their files with the MCAD and EEOC. See Exhibit C.

## FACTS

22.     While working in Dr. Ozcan's laboratory, Dr. Cabi's, Dr. Cakir's, and Dr. Mert's primary responsibilities were conducting research on the biology of obesity and diabetes, and drug development against these conditions, including designing and performing experiments and analyzing the resulting data.

23.     At a speech to the ADA in June 2012 in Philadelphia, Pennsylvania, Dr. Ozcan acknowledged the contributions of Dr. Cabi and Dr. Cakir, "Serkan and Isin are the really great scientists that are in my lab who did the drug and leptin resistance work." A link to that speech is here and the quote is at 00:26:13:

http://professional.diabetes.org/Adv_SearchResult.aspx?kwd=umut%20ozcan&sr=global&ResType=ALL&typ=0&adv=True.

24.     Dr. Ozcan wrote of Dr. Cakir in the budget justification of a grant proposal: "Dr. Cakir has extensive experience in animal studies, molecular biology, and biochemistry. Furthermore, he has extensive knowledge of ER stress, UPR signaling and leptin resistance. He is very well equipped to independently carry out all the experiments proposed in this application." See Exhibit D.

25.     On occasions, Dr. Ozcan introduced Dr. Cakir as his "best research fellow."

26.     Dr. Ozcan assigned Dr. Cakir to lead the POMC project in his laboratory and to supervise Dr. Mert before Dr. Mert's promotion to post-doctoral fellow in February 2014.

27.     In or around July 2013, Dr. Ozcan raised the salaries of Dr. Cabi and Dr. Cakir from around $42,000 to $49,500. Because of this raise, Dr. Cabi and Dr. Cakir were making more in salary than other postdoctoral fellows in the laboratory who had been there for the same amount of time as they had been.

28.     On November 12, 2013, Dr. Ozcan wrote a letter in which he stated about Dr. Cabi: "At the time Serkan started in my lab as a fellow, we were trying to set up screens to discover more powerful chemical chaperones. Serkan took a different approach and created algorithms and gene expression profile scoring methods to perform *in silico* screens. From these studies, we have discovered the most potent anti-obesity drug ever reported. Following this breakthrough, we expanded the project to investigate complete metabolic profiling, molecular mechanisms responsible for drug action, basic safety and even effects on mouse lifespan. Starting from this potent first drug he also discovered multiple other chemically unrelated drug candidates through computational searches, which identified at least one more molecule effective in mice. Serkan has completed all the studies in this work by himself, proved that these drugs are leptin sensitizers and this work is now being prepared as multiple publications in high profile journals." See Exhibit E.

29.     In this letter dated November 12, 2013, Dr. Ozcan wrote of Dr. Cabi: "I can comfortably and without overstatement say that Serkan is the smartest scientist that I have met in life, and he will have major contributions to scientific world throughout his career." See Exhibit E.

30.     During their time in Dr. Ozcan's laboratory, Dr. Cabi, Dr. Cakir, and Dr. Mert witnessed incidents of research misconduct and other misconduct by Dr. Ozcan. The incidents of research misconduct seemed to increase in the course of drafting several papers for publication.

31.     On February 7, 2014, Dr. Cabi and Dr. Cakir sent an anonymous email to Harvard Medical School's Ombuds Office seeking advice concerning research misconduct by Dr. Ozcan but without identifying themselves or Dr. Ozcan. See Exhibit F.

32.     On February 10, 2014, they met the Harvard Medical School Ombudsperson, Melissa Brodrick ("Ms. Brodrick"), without identifying Dr. Ozcan. Ms. Brodrick provided them with some options as to what they can do and informed them that a non-retaliation policy existed in cases such as theirs.

33.     On February 10, 2014, Dr. Cabi and Dr. Cakir also called August Cervini ("Mr. Cervini") (Vice President of Research Administration at Children's Hospital) to seek advice concerning research

misconduct by Dr. Ozcan. Dr. Cabi and Dr. Cakir did not identify themselves nor did they identify Dr. Ozcan in this call. Mr. Cervini suggested they talk to Attorney Dianne McCarthy ("Ms. McCarthy") (Chief Counsel for Research Affairs at Children's Hospital). Dr. Cabi and Dr. Cakir called Ms. McCarthy without revealing their identity or that of Dr. Ozcan. Ms. McCarthy encouraged them to report Dr. Ozcan's research misconduct and she assured them that a non-retaliation policy in place would protect them from any negative ramifications of doing so.

34.    Dr. Cabi made initial official reports to Ms. McCarthy on March 3, 2014, and to Ms. McCarthy, Mr. Cervini, and Attorney Gretchen Brodnicki ("Ms. Brodnicki") (Dean for Faculty and Research Integrity at Harvard Medical School) on March 4, 2014, about Dr. Ozcan:

a) forcing him secretly to conduct research for ERX using Children's Hospital and federal funding and resources under threat of retaliation;

b) committing research misconduct in scientific manuscripts, federal grant applications, and scientific meeting presentations, and forcing him to commit research misconduct under threat of retaliation in a drug development project with public health consequences;

c) creating a hostile work environment with constant cursing and humiliation, talking about his sexual exploits, not respecting his choice not to drink alcohol, and passing inappropriate comments about his personal life, as well as sexual comments about Dr Cabi's wife;

d) abusing his power by requiring use of Dr. Cabi's bank account for unexplained personal money transfers of unknown origin.

35.    Dr. Cakir made initial reports to Ms. McCarthy on March 3, 2014, and to Ms. McCarthy, Mr. Cervini, and Ms. Brodnicki on March 4, 2014, about Dr. Ozcan:

a) forcing him secretly to conduct research for ERX using Children's Hospital and federal funding and resources under threat of retaliation;

b) committing research misconduct in scientific manuscripts, federal grant applications, and scientific meeting presentations, and forcing him to commit research misconduct under threat of retaliation in a drug development project with public health consequences;

c) creating a hostile work environment with constant cursing and humiliation, talking about his sexual exploits, insulting his ethnic background, and using his cell phone against his will to harass his female friends as well as harass female employees of Children's Hospital;

d) abusing his power by requiring use of Dr. Cakir's bank account for unexplained personal money transfers of unknown origin.

36.    Dr. Mert made initial reports to Ms. McCarthy on March 3, 2014, and to Ms. McCarthy, Mr. Cervini, and Ms. Brodnicki on March 4, 2014, about Dr. Ozcan:

a) forcing him secretly to conduct research for ERX using Children's Hospital and federal funding and resources under threat of retaliation;

b) committing research misconduct in scientific manuscripts, federal grant applications, and scientific meeting presentations, and forcing him to commit research misconduct under threat of retaliation in a drug development project with public health consequences; and,

c) creating a hostile work environment with constant cursing and humiliation, threats, abuse of power, attempts to control his personal life, and attempts to limit his professional advancement by controlling his professional interactions and communications with fellow scientists in his division.

37.    The reports summarized in the three preceding paragraphs are described in more detail below.

38.     Because Children's Hospital is a teaching affiliate of Harvard Medical School, a Harvard Medical School committee has jurisdiction to conduct an inquiry and investigation into whether Dr. Ozcan committed research misconduct as it is defined by 42 C.F.R. §93. A Harvard Medical School committee is conducting this inquiry at the time of filing.

39.     Children's Hospital had in place at all relevant times a research misconduct policy.

40.     Ms. McCarthy in February 2014 (on the phone), and in March 2014 assured Dr. Cabi, Dr. Cakir, and Dr. Mert that Children's Hospital has a non-retaliation policy.

41.      Ms. McCarthy in March 2014 assured Dr. Cabi, Dr. Cakir, and Dr. Mert that they would not be damaged in any way because of their report of Dr. Ozcan's misconduct.

42.     Non-retaliation against individuals who report research misconduct is mandated by 42 C.F.R. §93.300-§93.302.

43.     Non-retaliation against individuals who report research misconduct is mandated by Children's Hospital's research misconduct policy.

44.     Non-retaliation against individuals who report research misconduct is mandated by Harvard Medical School's research misconduct policy.

45.     Ms. McCarthy in the February 2014 telephone call and in the March 2014 assured Dr. Cabi, Dr. Cakir, and Dr. Mert that Children's Hospital would cause to be assigned to each of them an independent senior professor to supervise each of them.

46.     On or about April 17, 2014, Ms. McCarthy gave a continuing legal education presentation hosted by the Boston Bar Association concerning research misconduct requirements and policies. One of her powerpoint slides during that presentation stated about Children's Hospital procedure, "Protections are put in place to protect the accused as well as those making allegations." See Exhibit G.

47.     After they reported his misconduct, Dr. Ozcan filed false charges of scientific misconduct against Dr. Cabi and Dr. Cakir in May 2014.

48.     The same Harvard Medical School committee to which reference is made in paragraph 38 above is conducting an inquiry into Dr. Ozcan's charges of research misconduct against Dr. Cabi and Dr. Cakir.

49.     On March 4, 2014, after they had made their report about Dr. Ozcan's misconduct, Dr. Majzoub in his office told Dr. Cabi and Dr. Cakir that he thought it was time for them to get promoted.

50.     Dr. Cabi and Dr. Cakir were not promoted after Dr. Majzoub's statement to them.

51.     On June 19, 2014, Children's Hospital removed Dr. Cabi, Dr. Cakir, and Dr. Mert from Dr. Ozcan's laboratory. See Exhibit H.

52.     On June 19, 2014, Children's Hospital removed Dr. Cabi, Dr. Cakir, and Dr. Mert from projects they each had developed. See Exhibit H.

53.      On June 19, 2014, Children's Hospital removed Dr. Cabi, Dr. Cakir, and Dr. Mert from projects on which they had invested years of their careers. See Exhibit H.

54.     On June 19, 2014, Children's Hospital represented to Dr. Cabi, Dr. Cakir, and Dr. Mert that, "Dr. Majzoub is speaking with other PI's [Principal Investigator] regarding your moving to another lab." See Exhibit H.

55.     Despite their requests, Children's Hospital never assigned a different professor to supervise work done by Dr. Cabi, Dr. Cakir, and Dr. Mert.

## I.      Patents

56.     In a letter dated October 6, 2014, Children's Hospital informed Dr. Cabi and Dr. Cakir of its intention to remove each of them from inventorship on two patent applications, Application PCT/US2013/061911 ("SR01") and Application 61/908,998 ("SR02") (collectively, "the Patents"). See Exhibit I. SR01 is also known as Celastrol.

57.     At all prior times, Dr. Cabi and Dr. Cakir had been considered by Children's Hospital as an inventor on the Patents. See Exhibit I.

58.     At all prior times, Dr. Cabi and Dr. Cakir had been listed as an inventor on relevant applications related to the Patents. See Exhibit J.

59.     In April 11, 2012, Dr. Ozcan in an email to Children's Hospital's Technology and Innovation Development Office ("TIDO") stated that Dr. Cabi and Dr. Cakir were co-inventors on SR01. See Exhibit K.

60.     Dr. Ozcan describes, in part, Dr. Cabi's contribution to the SR01 and SR02 projects in his letter dated November 12, 2013. See Exhibit E.

61.     Dr. Ozcan in text messages to Dr. Cabi and Dr. Cakir on March 3, 2014, stated that the SR01 and SR02 projects could not have been accomplished without them. See Exhibit L.

62.     Children's Hospital decided to remove Dr. Cabi and Dr. Cakir from inventorship on the Patents after they had reported Dr. Ozcan's misconduct. See Exhibit I.

63.     Removing Dr. Cabi and Dr. Cakir from inventorship on the Patents is retaliation for their reporting of Dr. Ozcan's misconduct.

64.     Children's Hospital claims to rely on a report from its patent attorney, Pabst Patent Group, to support its decision to remove Dr. Cabi and Dr. Cakir from inventorship on the Patents after they had reported Dr. Ozcan's misconduct.  See Exhibit I.

65.     Pabst Patent Group had previously prepared the applications that included Dr. Cabi and Dr. Cakir as inventors on the Patents. See Exhibit J.

66.     Despite numerous requests, Children's Hospital has not provided a copy of the Pabst Patent Group report to Dr. Cabi and Dr. Cakir or their counsel.

67.     When Dr. Cabi and Dr. Cakir raised concerns in early April 2014 that Dr. Ozcan was going to be inaccurately listed as an inventor on a third patent, Children's Hospital used the opportunity to open the question of inventorship as to SR01 and SR02.

68.     Inventorship as to SR01 and SR02 had been settled prior to April 2014 to include Dr. Cabi and Dr. Cakir. See Exhibits E, J, and K.

69.     Dr. Cabi and Dr. Cakir asked for an inventorship investigation as to a third patent, not SR01 or SR02.

70.     Pabst Patent Group conducted a cursory and result-driven investigation as to inventorship of SR01 and SR02 at the behest of its employer, Children's Hospital.

71.     The inventorship investigation as to the Patents was not thorough.

72.     The inventorship investigation as to the Patents was not conducted by an independent party.

73.     Dr. Cabi and Dr. Cakir each were limited to approximately one hour when speaking with the investigating attorney from Pabst Patent Group. Their attorney was not allowed to participate. Dr. Cabi and Dr. Cakir answered all questions directed by the Pabst Patent Group attorney and provided her all the data she requested. The Pabst Patent Group attorney raised no concern that Dr. Cabi and Dr. Cakir were not inventors on SR01 and SR02 during the interviews and she requested no clarification after the interviews.

74.     It is unknown what documents were made available by Children's hospital and Dr. Ozcan to the Pabst Patent Group as part of its inventorship investigation as to the Patents.

75.     For a competent inventorship investigation, Pabst Patent Group should have had access to all laboratory notebooks and documents related to SR01 and SR02.

76.     On information and belief, at least some of the laboratory notebooks referenced in the preceding paragraph have been destroyed, discarded, or otherwise lost by Dr. Ozcan and/or Children's Hospital. Dr. Cabi and Dr. Cakir have requested of Children's Hospital that laboratory notebooks be confiscated and protected but that does not seem to have occurred.

77.     Dr. Cabi and Dr. Cakir in July 2014 provided additional documentation and explanation to Pabst Patent Group showing that they each contributed to claims of the Patents and thus held inventorship rights as to SR01 and SR02.

78.     Dr. Cabi and Dr. Cakir copied Kahlil Mitchell of TIDO and Mr. Cervini on their emails transmitting the documentation referenced in the preceding paragraph to Pabst Patent Group

79.     In summary, Dr. Cabi identified SR01 in 2009 using a search method he developed. Dr. Cabi determined the relevant output parameter and identified a novel method to combine the results of several distinct experiments to identify SR01.

80.     Dr. Cabi and Dr. Cakir identified in February 2011 the anti-obesity and potential leptin sensitizing properties of SR02. Dr. Ozcan did not contribute to the experiments they devised to identify these properties but urged them instead to focus on a different and non-accurate idea.

81.     Dr. Cabi and Dr. Cakir designed and conducted the first direct biochemical and physiological experiments that proved the leptin sensitizing effects of SR01 and SR02 in animals. This major claim of the Patents was not established until Dr. Cakir joined the laboratory and established it. Dr. Ozcan was away in Germany during some of these experiments and Dr. Cabi and Dr. Cakir did this work without any input or suggestions from him. These experimental designs later formed parts of the SR01 and SR02 patent applications. See Exhibit J.

82.     Dr. Majzoub is listed as an inventor on SR01. See Exhibit J.

83.     Dr. Majzoub did not contribute to the SR01 project.

84.     Dr. Majzoub, however, has an interest in ERX, which hopes to market SR01 as an anti-obesity drug.

85.     Dr. Cabi, Dr. Cakir, and Dr. Mert do not have any interest in ERX.

86.     After they made their reports concerning his misconduct, Dr. Ozcan has falsely accused Dr. Cabi and Dr. Cakir of trying to "steal" control of the SR01 and SR02 projects for a competing startup

company he inaccurately believes they planned to form.

87.     The Children's Hospital intellectual policy in place until January 20, 2015, stated: "The Hospital owns all research results and intellectual property, whether tangible or intangible, developed by any person on the premises of the Hospital, or through substantial use of the Hospital's resources or facilities, or that relates to the research conducted by such person for the Hospital, or by a person within the scope of his or her employment by the Hospital." See Exhibit M.

88.     At all times, Dr. Cabi, Dr. Cakir, and Dr. Mert complied with the Children's Hospital intellectual policy in place until January 20, 2015.

## II.     Publications

89.     Children's Hospital and Dr. Ozcan have retaliated against Dr. Cabi, Dr. Cakir, and Dr. Mert by preventing them from publishing scientific manuscripts based on their work.

90.     Dr. Cabi, Dr. Cakir, and Dr. Mert reported in March 2014 Dr. Ozcan's research misconduct in relation to a manuscript concerning SR01 (the "SR01 Manuscript") and another manuscript concerning SR02 (the "SR02 Manuscript"). SR01 and SR02 acted as anti-obesity compounds in mice.

91.     Dr. Cabi, Dr. Cakir, and Dr. Mert reported in March 2014 that Dr. Ozcan fabricated data and falsified data that he included in both the SR01 Manuscript and the SR02 Manuscript. Dr. Cabi, Dr. Cakir, and Dr. Mert also reported that Dr. Ozcan presented some data in the SR01 Manuscript and the SR02 Manuscript in a misleading way. Dr. Cabi, Dr. Cakir, and Dr. Mert also reported that Dr. Ozcan reported or planned to report falsified data in an NIH grant or progress report.

92.     Both the SR01 Manuscript and SR02 Manuscript were to be submitted simultaneously as communicated to the journal editor of *Cell* by Dr. Ozcan in January 2014.

93.     The report by Dr. Cabi, Dr. Cakir, and Dr. Mert temporarily stopped submission of the SR01 Manuscript and the SR02 Manuscript containing fraudulent data.

94.     On or around March 3, 2014, Dr. Ozcan sent Dr. Cabi and Dr. Cakir apologetic text messages, emails, and messages on Facebook in which he assured them that he would not include data to which he believes they objected in the SR01 Manuscript and the SR02 Manuscript. Dr. Ozcan apologized to Dr. Cabi and Dr. Cakir. See Exhibits L and N.

95.     After Dr. Cabi, Dr. Cakir, and Dr. Mert reported in March 2014 Dr. Ozcan's research misconduct, focus turned to the SR01 Manuscript. The SR02 manuscript was put on hold and Children's Hospital acted like there was no misconduct report about it.

96.     Dr. Cabi, Dr. Cakir, and Dr. Mert produced a version of the SR01 Manuscript that contained valid data in the beginning of April 2014. Dr. Ozcan had produced a version of the SR01 Manuscript that included falsified data and misleading presentation of data.

97.     Dr. Majzoub originally told Dr. Cabi, Dr. Cakir, and Dr. Mert that he liked their version of the SR01 Manuscript and saw no reason why it could not be published.

98.     Shortly thereafter, Dr. Majzoub talked to Dr. Ozcan and then informed Dr. Cabi, Dr. Cakir, and Dr. Mert that their version of the SR01 Manuscript could not be published.

99.     Children's Hospital represented Dr. Majzoub as an independent party who would help resolve the conflicting data in the SR01 Manuscript.

100.     Dr. Majzoub in actuality had a conflict of interest concerning SR01, as does Dr. Ozcan.

101.    In April 2014, Dr. Majzoub instructed Dr. Cabi, Dr. Cakir, and Dr. Mert to include falsified data and falsified interpretation in the SR01 manuscript. Dr. Cabi, Dr. Cakir, and Dr. Mert rejected Dr. Majzoub's instructions.

102.    In April 2014, Dr. Majzoub instructed Dr. Cabi, Dr. Cakir and Dr. Mert to provide to Dr. Ozcan a detailed analysis of some of the data concerning which they filed their scientific misconduct allegations against Dr. Ozcan.

103.    In April 2014, Dr. Majzoub informed Dr. Cabi, Dr. Cakir and Dr. Mert that Dr. Ozcan had asked for the quantification of a fabricated western blot. Dr. Majzoub in emails stated that Dr. Ozcan wanted this quantification and even after objection by Dr. Cabi, Dr. Cakir, and Dr. Mert, Dr. Majzoub insisted that Dr. Ozcan wanted it anyway. Because their division head, Dr. Majzoub, asked for this quantification, Dr. Cabi and Dr. Cakir carried out the quantification and sent it to Dr. Majzoub by email while noting for him that it had been fabricated data to which they had objected.

104.    In May 2014, Dr. Ozcan denied ever having asked for the quantification of the fabricated western blot and asked for the removal of Dr. Cabi and Dr. Cakir from his laboratory because they had performed this quantification. Dr. Ozcan also used this information to craft his false scientific misconduct allegations against Dr. Cabi and Dr. Cakir. Dr. Majzoub knew why Dr. Ozcan wanted this information; moreover, before he asked them to perform the quantification, Dr. Cabi, Dr. Cakir, and Dr. Mert warned Dr. Majzoub, Ms. McCarthy, and Mr. Cervini that they feared Dr. Ozcan would retaliate against them. Dr. Majzoub thus assisted Dr. Ozcan to craft false accusations against Dr. Cabi and Dr. Cakir and thus tampered with the HMS investigatory process.

105.    In May 2014, Dr. Cabi, Dr. Cakir, and Dr. Mert reported Dr. Majzoub's actions and conflict of interest to Mr. Cervini. That same month, Dr. Cabi and Dr. Cakir reported to Ms. McCarthy that Dr. Majzoub was not a neutral party in this matter and that he had a conflict of interest. Children's Hospital took no action regarding Dr. Majzoub.

106.    In September 2014, Children's Hospital assigned another professor, Morris White, PhD ("Dr. White"), to assist with the SR01 Manuscript.

107.    Dr. Ozcan provided a copy of the SR01 Manuscript that contained falsified data and intentional misrepresentation of results.

108.    Dr. Cabi, Dr. Cakir, and Dr. Mert worked with Dr. White for about 2 months on the SR01 Manuscript.

109.    Dr. White in an email stated to Dr. Cabi, Dr. Cakir, and Dr. Mert that he agreed with their points regarding invalid or misleading data in Dr. Ozcan's version of the SR01 Manuscript. See Exhibit O.

110.    Dr. White asked Dr. Cabi, Dr. Cakir, and Dr. Mert to provide him with their version of the SR01 Manuscript, which they did.

111.    Dr. Cabi, Dr. Cakir, and Dr. Mert also provided Dr. White, at his request, the raw data related to certain experiments referenced in the SR01 Manuscript.  Dr. Cabi, Dr. Cakir, and Dr. Mert also provided Dr. White an Excel spreadsheet file listing falsified figures in Dr. Ozcan's version of the SR01 Manuscript. Dr. White provided this Excel spreadsheet file to Gary R. Fleisher, MD ("Dr.

Fleisher") (Chief of Children's Hospital's Department of Medicine) to inform him of the falsified data in Dr. Ozcan's version of the SR01 Manuscript.

112.   In subsequent meetings, Dr. White stated that he agreed with the validity of the version of the SR01 Manuscript written by Dr. Cabi, Dr. Cakir, and Dr. Mert. Dr. White also suggested some improvements to it. See Exhibit O.

113.   Dr. White agreed with Dr. Cabi, Dr. Cakir, and Dr. Mert not to include some of Dr. Ozcan's data in the SR01 Manuscript. See Exhibit O.

114.   After Dr. Cabi, Dr. Cakir, and Dr. Mert made changes pursuant to Dr. White's questions and comments, Dr. White informed them that Children's Hospital was moving toward submitting Dr. Ozcan's version of the SR01 Manuscript instead.

115.   Children's Hospital and Dr. Ozcan then gave Dr. Cabi, Dr. Cakir, and Dr. Mert the opportunity to publish the SR01 Manuscript but only if they accepted the validity of all of Dr. Ozcan's data. See Exhibit P.

116.   On November 24, 2014, Dr. Fleisher sent Dr. Cabi, Dr. Cakir, and Dr. Mert a letter concerning the SR01 Manuscript's proposed upcoming submission scheduled for November 26, 2014 See Exhibit P.

117.   Dr. Cabi, Dr. Cakir, and Dr. Mert received Dr. Fleisher's letter on November 25, 2014, and it had a response deadline of 4:00 p.m. on November 26, 2014. See Exhibit P.

118.   Dr. Fleisher's letter claimed that a copy of the proposed SR01 Manuscript was included in the mailing. A copy of the SR01 Manuscript was not included, however. See Exhibit P.

119.   Dr. Fleisher's letter offered Dr. Cabi, Dr. Cakir, and Dr. Mert three choices concerning the SR01 Manuscript: (a) agree to co-authorship and agree with the validity of all data contained within it; (b) agree to co-authorship with acknowledgment as to participation only as to certain portions of data but agree with the validity of all data contained in it; or, (c) agree not to be a co-author at all. See Exhibit P.

120.   Dr. Cabi, Dr. Cakir, and Dr. Mert sent, before the response deadline, an email to Dr. Fleisher asking for a copy of the SR01 Manuscript proposed to be submitted. In that email Dr. Cabi, Dr. Cakir, and Dr. Mert each stated, "I have: (1) no obligation to be an author on a fraudulent manuscript; and, (2) no obligation to give up my authorship rights of my work. Your letter requests that I choose between those two options and I can do neither." See Exhibit P.

121.   In its responses to the MCAD Complaints, Children's Hospital erroneously claimed Dr. Cabi, Dr. Cakir, and Dr. Mert chose not to be authors on the SR01 manuscript; in reality, they refused to forfeit their authorship rights but at the same time refused to allow their names to be associated with a manuscript tainted by research misconduct. See Exhibit Q.

122.    Dr. Fleisher subsequently sent Dr. Cabi, Dr. Cakir, and Dr. Mert a copy of the SR01 Manuscript. As Dr. Cabi, Dr. Cakir, and Dr. Mert anticipated, the manuscript was Dr. Ozcan's version and it contained the falsified data to which they had objected.

123.   On the version of the SR01 manuscript sent to Dr. Cabi, Dr. Cakir, and Dr. Mert in November 2014, two post-doctoral fellows who did not contribute to the project were listed as equally-contributing co-first authors as Dr. Cabi and Dr. Cakir. Dr. Mert's name also now appeared sixth in the list of authors; earlier versions listed him third. These changes diminished and diluted all of their

contributions.

124.    Dr. Ozcan's version of the SR01 Manuscript was submitted to a scientific journal, *Cell*, without the names of Dr. Cabi, Dr. Cakir, and Dr. Mert as authors.

125.    The removal of their names as authors of the SR01 Manuscript means Dr. Cabi, Dr. Cakir, and Dr. Mert each lost a valuable publication from their curriculum vitae. By removing their names without their approval, Children's Hospital and Dr. Ozcan have also committed plagiarism.

126.    The SR01 Manuscript containing falsified, fraudulent, and/or misleading data has been published by the journal, *Cell*. The citation is Liu, Junli et al. *Cell*, Volume 161, Issue 5 , 999 – 1011 and it is online at http://www.cell.com/abstract/S0092-8674(15)00559-0.

127.    By submitting the SR01 Manuscript for publication before the report of the Harvard Medical School committee as to the data it contains, Dr. Ozcan and Children's Hospital have circumvented that Harvard Medical School committee referenced in Paragraph 38 above.

128.    Children's Hospital participated in the removal of Dr. Cabi, Dr. Cakir, and Dr. Mert from authorship of the SR01 Manuscript.

129.    Dr. Fleisher's letter of November 24, 2014, gave Dr. Cabi, Dr. Cakir, and Dr. Mert a choice between authorship on a manuscript containing data to which they objected or giving up their authorship rights. See Exhibit P.

130.    Dr. Fleisher wrote his letter of November 24, 2014, on Children's Hospital letterhead. See Exhibit P.

131.    Dr. Fleisher was serving as Chief of Medicine at Children's Hospital on November 24, 2014.

132.    On information and belief, the SR02 Manuscript has or will be submitted for publication with invalid data and without the names of Dr. Cabi, Dr. Cakir, or Dr. Mert as authors.

133.    Dr. Ozcan has prevented Dr. Mert's publication of research related to his doctoral dissertation.

### III.    Dr. Ozcan's workplace misconduct

134.    Dr. Ozcan created a hostile work environment, abused his power, threatened retaliation, and retaliated against members of his laboratory, including but not limited to Dr. Cabi, Dr. Cakir, and Dr. Mert.

135.    Children's Hospital knew about Dr. Ozcan's behavior as summarized in the preceding paragraph, and that people at Dr. Ozcan's laboratory were subjected to it, because of prior complaints from Drs. Ayse Seda Ergin (Sonmez), Lale Ozcan, Amani Batarseh, Marie Daval, Allen Lu, and others.

136.    Several of Dr. Ozcan's laboratory members also complained to Dr. Majzoub about Dr. Ozcan's behavior.

137.    In December 2011, Dr. Ozcan equated African Americans to monkeys when Dr. Cabi, Dr. Cakir, and several other members of his laboratory were at a meal at the Beer Works restaurant in Kenmore Square, Boston.

138.    On June 23, 2012, at a laboratory social event Dr. Ozcan held in his house, Dr. Ozcan gave Dr. Cabi a drink or drinks which, according to Dr. Ozcan, did not contain alcohol. Dr. Ozcan knew that Dr. Cabi did not drink alcohol. Dr. Ozcan also knew that the drink(s) contained alcohol and he had them prepared with lots of mint and sugar to hide the taste of alcohol. For two years following this incident, Dr. Ozcan mocked Dr. Cabi publicly and in front of his co-workers for drinking alcohol.

139.    Throughout his entire time at his laboratory, Dr. Ozcan abused his power in an attempt to control Dr. Cabi's personal life, demanding of him that he report to him what he was doing outside work and demanding that he be present at the laboratory every weekend even if not required by the experimental schedules.

140.    Dr. Ozcan repeatedly and routinely made inappropriate comments in front of Dr. Cabi's colleagues at work, such as saying that Dr. Cabi was having too much sex with his wife.

141.    Dr. Ozcan repeatedly and routinely told explicit sexual stories about his personal life and spoke about his sexual prowess, particularly whenever he returned from scientific meetings or vacation. This behavior created an extremely uncomfortable work environment for Dr. Cabi, Dr. Cakir, and Dr. Mert.

142.    In February 2014, Dr. Ozcan sent Dr. Cabi and Dr. Cakir an email expressing anger toward them and threatening that two manuscripts prepared for submission to the scientific journal *Cell* would be combined into a single manuscript and submitted to a less prestigious journal so as to harm their careers. Such threats were routine by Dr. Ozcan during the years Dr. Cabi and Dr. Cakir were in his laboratory.

143.    Dr. Ozcan sometimes demanded of Dr. Cabi and Dr. Cakir specific data from certain experiments, regardless of the actual outcome, and sought to ensure compliance by threatening not to write them a recommendation letter and threatening not to publish their research results.

144.    In 2012, Dr. Ozcan instructed Dr. Cakir and another member of his laboratory, Dr. Hilde Herrema ("Dr. Herrema"), to lie when interviewed by Children's Hospital after Dr. Amani Batarseh reported that Dr. Ozcan sexually harassed her. Dr. Ozcan asked Dr. Cakir to say that Dr. Batarseh liked to talk about male genital organs all the time and that she was an obscene and indecent person. Dr. Ozcan asked Dr. Cakir to say highly positive things about him.

145.    In May 2013, Dr. Ozcan grabbed Dr. Cakir's iPhone by force against his will and used it to send sexual text messages to Kelly Feeley ("Ms. Feeley") (Program Manager of Endocrinology Division). Dr. Ozcan pretended to be Dr. Cakir texting Ms. Feeley and in the texts, Dr. Ozcan invited her to his house.

146.     Later on the same night he used Dr. Cakir's phone to text Ms. Feeley, Dr. Ozcan had an automobile accident while driving under the influence of alcohol while Dr. Cakir was in his vehicle. Dr. Cakir was also in Dr. Ozcan's vehicle during a May 2012 drunk driving accident in which Dr. Ozcan hit a parked vehicle.

147.    In late May 2013, Dr. Ozcan again grabbed Dr. Cakir's iPhone by force against his will and used it to send sexual text messages to Dr. Cakir's female friend, Berna Tosun ("Ms. Tosun"). Again, Dr. Ozcan pretended to be Dr. Cakir texting Ms. Tosun to invite her to Dr. Ozcan's house. Dr. Ozcan had invited Ms. Tosun to his house a week earlier when he had met her.

148.    Dr. Ozcan pressured Dr. Cakir to arrange dates for him with the sister of Dr. Cakir's girlfriend. Dr. Ozcan used Dr. Cakir's iPhone to send a text message to Dr. Cakir's girlfriend, pretending to be Dr. Cakir. In the text message, Dr. Ozcan praised himself and asked Dr. Cakir's girlfriend to arrange a meeting for him with her sister.

149.    Dr. Ozcan forced Dr. Cakir to text him while he was on dates. Dr. Ozcan instructed Dr. Cakir to

write as if he was a woman who wanted him sexually. Dr. Ozcan would change Dr. Cakir's name in his phone to that of a woman and leave the phone out so that his date would see the text and think other women wanted him sexually.

150.    In late February 2014, in the Center for Life Sciences 16th floor conference room, Dr. Ozcan asked Dr. Cabi and Dr. Cakir a question on a scientific matter. They answered Dr. Ozcan's question. Dr. Ozcan then said in Turkish in front of Dr. Mert: "If your answer is not correct, I am going to hire two gay black men and get you fucked in the ass." Such statements were routine for Dr. Ozcan in interacting with subordinates.

151.    Dr. Ozcan repeatedly mocked Dr. Cakir's ethnic background in front of other people, told him that he looked as stupid as a Laz (referring to Dr. Cakir's background), that he looked as empty as a Laz, and that he was as stupid as a person from the Black Sea region, which is the region from which Dr. Cakir and his family originate.

152.    After Dr. Cakir made his complaint in March 2014, Dr. Ozcan continued calling Dr. Cakir names next to his colleagues and other professors. For example, Dr. Ozcan kept calling Dr. Cakir an "asshole" in front of Dr. Herrema.

153.    In 2012 in his office, Dr. Ozcan said to Dr. Cabi, Dr. Cakir, and Dr. Mert that all Turkish women are worth is "being fucked." Dr. Ozcan knew their mothers are Turkish. Dr. Ozcan passed similar comments at other times.

154.    Dr. Ozcan would threaten Dr. Mert that if he did not like experiment results, or if Dr. Mert failed to publish what he called a "sexy, sensational paper," or did not produce for him the data results he wanted (regardless of an experiment's outcome), he would terminate Dr. Mert, write a bad recommendation letter about him, and cancel publication of one of his projects.

155.    Dr. Ozcan would threaten Dr. Cabi, Dr. Cakir, and Dr. Mert if the data from experiments differed from what he expected. If the findings conflicted with what he wanted, Dr. Ozcan typically would first curse and accuse the person at issue of being an "idiot," including in front of other colleagues. When Dr. Cabi, Dr. Cakir, and Dr. Mert would insist on the accuracy of their findings, often because they had obtained the same result from repeated experiments, Dr. Ozcan would threaten to terminate them or take other action.

156.    In March 2013, Dr. Ozcan stated loudly that African Americans were useful only for cleaning jobs. An African American cleaning lady with whom Dr. Mert chatted occasionally was on the hall and Dr. Mert said to Dr. Ozcan, "this woman works so hard, like our grandmothers," and Dr. Ozcan replied, "these blacks and Mexicans are only useful for cleaning jobs."

157.    While Dr. Mert was in Turkey during defense of his PhD thesis, Dr. Ozcan sent him emails demanding that he put Dr. Ozcan's name on its cover. Dr. Ozcan said he would not allow publishing anything from the thesis until he and Dr. Cabi and Dr. Cakir provided him with the data he wanted for the SR01 and SR02 projects. The research from Dr. Mert's thesis remains unpublished and is growing increasingly stale.

158.    Dr. Ozcan frequently accused Dr. Mert of being a terrorist, including in front of other people.

159.    Dr. Ozcan frequently described Dr. Mert as "filth."

160.    When Dr. Mert returned from Turkey as a post-doctoral research fellow on February 27, 2014, Dr. Ozcan told him, "you are not a PhD level person, I had to give this shit load of money because of NIH regulations. Because of this, you have to buy my coffee every day from your budget."

161.    Dr. Ozcan often forces people in his laboratory to do personal, non-research related service work for him.

162.    Dr. Ozcan frequently used sexual language in the workplace. Dr. Ozcan would describe experiments by Dr. Cabi, Dr. Cakir, and Dr. Mert as "masturbation" in front of people from other laboratories. In an effort to combat Dr. Ozcan's requests for invalid data, Dr. Cabi, Dr. Cakir, and Dr. Mert would suggest to Dr. Ozcan that certain experiments be repeated so as to reiterate the accuracy of their findings; Dr. Ozcan would dismiss doing so as "masturbation" to indicate that he thought repeating the experiments was unnecessary. Dr. Ozcan would also often say, "I will fuck you if [a specific] experiment won't be finished today."

163.    Dr. Ozcan abused his power and further harmed their careers by prohibiting Dr. Cabi, Dr. Cakir, and Dr. Mert from interacting with certain other scientists. Dr. Ozcan prohibited Dr. Cabi, Dr. Cakir, and Dr. Mert from speaking with some scientists even within their own division at Children's Hospital. For example, Dr. Ozcan forbade Dr. Cabi, Dr. Cakir, and Dr. Mert from speaking with David Breault, M.D., Ph.D. ("Dr. Breault"). Dr. Ozcan referred to Dr. Breault as "the son of a whore" and repeatedly expressed hatred for him.

164.    Dr. Ozcan described nearly every other principal investigator in his department in derogatory terms and as one of his enemies.

165.    Dr. Ozcan prohibited Dr. Cabi and Dr. Cakir from attending a periodic scientific seminar series organized at the Longwood Campus where researchers present their findings and network with each other. Dr. Ozcan prohibited their attendance because these gatherings were organized by his former advisor, Gokhan Hotamisligil, M.D., Ph.D. ("Dr. Hotamisligil"), who Dr. Ozcan called "the son of a whore." Dr. Hotamisligil is chair of the Department of Genetics and Complex Diseases at Harvard School of Public Health.

166.    Dr. Ozcan prohibited Dr. Cabi and Dr. Cakir from interacting with Nancy Hancer, Ph.D., Dr. White (a leading diabetes researcher in the same division as Dr. Ozcan), and Sudha Biddinger, M.D., Ph.D. (an assistant professor in the same division as Dr. Ozcan).

167.    During the time Dr. Mert was a research assistant in Dr. Ozcan's laboratory, Dr. Ozcan prohibited him from talking with Maria Joachim ("Ms. Joachim"), a research assistant in Dr. Majzoub's laboratory and now a doctoral candidate at the University of Michigan. Ms. Joachim had heard about Dr. Ozcan's behavior and reported it to Dr. Majzoub, for which Dr. Ozcan would refer to her as a whore. For instance, in late May 2012 or early June 2012, Dr. Ozcan told Dr. Mert, "if I see you talking with this whore I will fuck you."

168.    Children's Hospital received several reports about Dr. Ozcan's conduct in his laboratory but did not make an adequate investigation nor did it take adequate remedial actions to address them.

169.    According to Children's Hospital's position statements in response to the MCAD Complaints, one of Children's Hospital's counsel conducted an investigation after Dr. Cabi, Dr. Cakir, and Dr. Mert made work environment related complaints in March 2014. See Exhibit Q.

170.    According to Children's Hospital's position statements in response to the MCAD Complaints, the investigation to which reference in made in paragraph __ found that Dr. Ozcan: (a) "routinely subjected his staff to generalized, non-race or sex-based threats, intimidation, humiliation, language and behavior that was both offensive and stress-inducing"; (b) made "demands that work be redone until results he liked were reached, and threats to his researchers' abilities to publish the results of their work" which "reflected a hostile and aggressive leadership style[.]" See Exhibit Q.

171.    In his position statement under oath in response to the MCAD Complaints, Dr. Ozcan inaccurately states that Children's Hospital did not make such findings. Children's Hospital subsequently filed a statement to the MCAD repudiating Dr. Ozcan's misstatement. See Exhibit Q.

## IV.    Dr. Ozcan's unethical financial practices

172.    In September 2013, Dr. Ozcan abused his power by giving Dr. Cakir $1,800 and instructing him to deposit that money to his personal bank account. The next day, Dr. Ozcan asked Dr. Cakir to return the money to him. Dr. Cakir felt obligated and pressured to participate because Dr. Ozcan was his supervisor. Dr. Ozcan expressed an unclear concern about the IRS but never gave Dr. Cakir a clear explanation as to why he forced him to make this financial transaction.

173.    In September 2013, Dr. Ozcan abused his power by giving Dr. Cabi $2,700 and instructing him to deposit that money to his personal bank account. The next day, Dr. Ozcan asked Dr. Cabi to return the money to him. Dr. Cabi felt obligated and pressured to participate because Dr. Ozcan was his supervisor. Dr. Ozcan expressed an unclear concern about the IRS but never gave Dr. Cabi a clear explanation as to why he forced him to do make this financial transaction.

174.    In January 2014, Dr. Ozcan in his house offered Dr. Cabi $12,000-15,000 to conduct research secretly in Children's Hospital facilities using the resources of Children's Hospital and NIH for ERX's work.

175.    In January 2014, Dr. Ozcan in his house offered Dr. Cakir $12,000-15,000 to conduct research secretly in Children's Hospital facilities using the resources of Children's Hospital and NIH for ERX's work.

176.    In February 2014, Dr. Ozcan forced Dr. Cabi, Dr. Cakir, and Dr. Mert to test the potency of an ERX compound on mice purchased by NIH funding provided to Children's Hospital.

177.    According to Children's Hospital's position statements in response to the MCAD Complaints, the investigation to which reference in made in Paragraph 169 found that "Dr. Ozcan inappropriately requested that Drs. Cakir and Cabi use the Hospital's facilities and its mice to perform tests for his own company in direct contradiction of his obligations and representations under the Hospital's Conflict of Interest Management Plan[.]" In these position statements, Children's Hospital failed to acknowledge that these mice resources are paid for by federal funds and Dr. Cakir was paid full time through federal funds. See Exhibit Q.

178.    On information and belief, Children's Hospital failed to inform the NIH or other relevant agencies about this misuse of federal funds to which reference is made in the preceding paragraph.

179.    According to Children's Hospital's position statements in response to the MCAD Complaints, the investigation to which reference in made in Paragraph 169 found that, "Without legitimate reason, Dr. Ozcan asked Drs. Cakir and Cabi to deposit large sums of money into their bank accounts and then quickly to return those amounts to him, allegedly putting Drs. Cakir and Cabi at risk for tax liabilities he feared he would face by depositing large sums of cash into his own account." See Exhibit Q.

## V.    Retaliation against Dr. Cabi, Dr. Cakir, and Dr. Mert

180.    After March 2014, Dr. Ozcan told his laboratory members to stop talking to Dr. Cabi, Dr. Cakir, and Dr. Mert.

181.    During April-June 2014, Dr. Ozcan rejected the purchase of research materials Dr. Cabi and Dr. Cakir needed to continue conducting their experiments.

182.    During April-June 2014, Dr. Ozcan ordered the termination of some of Dr. Cabi's and Dr. Cakir's ongoing experiments.

183.    During April-June 2014, Dr. Ozcan specifically prohibited the research assistants in the laboratory from helping Dr. Cabi, Dr. Cakir, and Dr. Mert. These research assistants were allowed to help other people in the laboratory.

184.    During May-June 2014, Dr. Cabi and Dr. Cakir were not allowed to handle mice, although mouse work was at the core of their research projects and involved almost 100% of their jobs.

185.    After they reported Dr. Ozcan's misconduct, Dr. Cabi and Dr. Cakir were informed that Children's Hospital would remove them from inventorship on the SR01 and SR02 patents. See Exhibit H.

186.    After they reported Dr. Ozcan's misconduct, Dr. Cabi, Dr. Cakir, and Dr. Mert were stripped of authorship of the SR01 Manuscript unless they were willing to acknowledge the validity of data they considered fabricated and invalid. See Exhibit P.

187.    On information and belief, Dr. Cabi, Dr. Cakir, and Dr. Mert have been or will be stripped of authorship on the SR02 Manuscript.

188.    In February 2014, Dr. Ozcan emailed Dr. Cabi and Dr. Cakir to suggest that they apply for fellowships offered by the ADA. In March 2014, Dr. Majzoub told Dr. Cabi and Dr. Cakir that they could apply for fellowships with his support. In April 2014, Dr. Cabi and Dr. Cakir emailed Dr. Majzoub stating that they wanted to apply for the ADA fellowships. Dr. Majzoub now would not permit them to do so and instead, a different post-doctoral fellow at Dr. Ozcan's laboratory, Dr. Jaemin Lee, was allowed to apply for it.

189.    In November 2014, Dr. Cakir wanted to attend a scientific conference to present some of his

research findings and network with other scientists in his field. Typically, Children's Hospital covers all conference-related expenses for post-doctoral fellows who attend conferences. Two years earlier, for instance, Children's Hospital stated in writing it would pay all Dr. Cakir's expenses related to a conference he wanted to attend. However, Children's Hospital refused to cover his expenses to the November 2014 conference and he could not afford to attend it without the institutional support to which he was entitled. Dr. Cakir lost another chance of interacting with the scientific community, and presenting his findings, which damaged his career. See Exhibit R.

190.    Despite its assurances to them, and their requests to it that it do so, Children's Hospital did not honor its assurances and representations to Dr. Cabi, Dr. Cakir, and Dr. Mert that it would assign another professor to work with them.

191.    Children's Hospital did not honor assurances and representations made on June 19, 2014, to Dr. Cabi, Dr. Cakir, and Dr. Mert that it would find other laboratories at which they could work.

192.    In fact, after June 19, 2014, Children's Hospital made no effort to place Dr. Cabi, Dr. Cakir, or Dr. Mert in a different laboratory.

193.    After their removal from Dr. Ozcan's laboratory, Dr. Cabi, Dr. Cakir, and Dr. Mert have not been able to work on their ongoing projects nor have they been able to publish manuscripts based on already completed projects.

194.    After his removal from Dr. Ozcan's laboratory, and without assistance from Children's hospital, Dr. Cabi obtained a position in the laboratory of Wesley Wong, Ph.D. ("Dr. Wong") at Children's Hospital.

195.    Dr. Cabi and Dr. Wong developed a good working relationship.

196.    Dr. Wong's laboratory had funding for Dr. Cabi to work there.

197.    Dr. Wong indicated that he would like Dr. Cabi to work in his laboratory and head up a project related to a federal grant recently sought.

198.    Children's Hospital on April 15, 2015, terminated Dr. Cabi from Dr. Wong's laboratory.

199.    Children's Hospital gave no legitimate reason for its decision not to allow Dr. Cabi to work in Dr. Wong's laboratory. Yet, to the contrary, in its responses to the MCAD Complaints, Children's Hospital claimed under oath that it endeavored to find another principal investigator for each of Dr. Cabi, Dr. Cakir, and Dr. Mert. See Exhibit R. In reality, Children's Hospital did not so endeavor and when Dr. Cabi found a suitable replacement principal investigator, Children's Hospital terminated him from working in that laboratory.

200.    Dr. Wong did not agree with Children's Hospital's choice to prohibit Dr. Cabi from working in his laboratory.

201.    Terminating Dr. Cabi from Dr. Wong's laboratory contradicts Children's Hospital's assurance that it would assist Dr. Cabi in relocating to another laboratory.

202.    Children's Hospital admits in its position statement to the MCAD Complaints that it "assured [Dr. Cabi, Dr. Cakir, and Dr. Mert] that the Hospital would assist them in relocating to another lab[.]" See Exhibit R.

203.    On April 17, 2015, Children's Hospital sent counsel for Dr. Cabi and Dr. Mert a letter terminating them from all connection with it as of April 30, 2015. See Exhibit S.

204.    Dr. Cakir earlier in 2015 obtained a post-doctoral fellowship position at Vanderbilt University.

205.    Dr. Ozcan inappropriately contacted Dr. Cakir's principal investigator at Vanderbilt University in May 2015.

206.    Pursuant to its letter of April 17, 2015, Children's Hospital has broken assurances to Dr. Cabi and Dr. Mert made in writing on June 19, 2014, in which it agreed to pay "salary and miscellaneous expenses for a one year period[.]" See Exhibit S.

207.    While Children's Hospital agreed in its letter of April 17, 2015, to pay the remaining salary owed to Dr. Cabi and Dr. Mert, it did not continue to pay for miscellaneous expenses such as their health insurance.

208.    Children's Hospital also knows that Dr. Cabi and Dr. Mert are on a work visa and that terminating them prematurely and unexpectedly jeopardizes their ability to remain in the United States.

## VI.    Spoliation of evidence and computer forensics issues

209.    After Dr. Cabi, Dr. Cakir, and Dr. Mert reported in March 2014 Dr. Ozcan's misconduct to Children's Hospital, Children's Hospital confiscated all their research materials and computer files related to the projects on which they had been working.

210.    Children's Hospital failed at this time to secure research materials, including laboratory notebooks and computers, in Dr. Ozcan's possession. Dr. Cabi and Dr. Cakir voluntarily gave the research files they had in their laptops to Children's Hospital.

211.    Dr. Cabi, Dr. Cakir, and Dr. Mert notified Children's Hospital repeatedly in the following months about the need to safeguard materials in Dr. Ozcan's possession. Children's Hospital ignored these requests. These notebooks and other research materials were important for manuscripts they wanted to publish concerning the projects on which they had been working, the Harvard Medical School scientific misconduct inquiry, and the issue of determining inventorship as to the Patents.

212.    Dr. Cabi, Dr. Cakir, and Dr. Mert have not been allowed by Children's Hospital to see all of the laboratory notebooks or other materials related to the Patents, research misconduct, and manuscripts.

213.    Dr. Ozcan did not allow Dr. Cabi, Dr. Cakir, and Dr. Mert to see certain requested materials. See Exhibit T.

214.    On information and belief, some or all of the laboratory notebooks related to the Patents, research misconduct, and manuscripts have been destroyed or discarded.

215.    On August 4, 2014, Children's Hospital informed Dr. Cabi, Dr. Cakir, and Dr. Mert that it had lost all the copies of the materials including the images of the hard drives it confiscated in March 2014, with no backup. Despite repeated requests, Children's Hospital has never explained to Dr. Cabi, Dr. Cakir, and Dr. Mert or their counsel what happened to these materials.

216.    According to one of Children's Hospital's counsel, the materials referenced in the preceding paragraph were being stored in Mr. Cervini's office until they went missing.

217.    Children's Hospital failed to preserve confiscated research materials, therefore spoliating

evidence as to Dr. Ozcan's misconduct. Children's Hospital's spoliation also helps Dr. Ozcan in false accusations against Dr. Cabi and Dr. Cakir.

218.     On or around March 3 and 4, 2014, Dr. Ozcan deleted more than a hundred files related to both the SR01 Manuscript and the SR02 Manuscript from a shared cloud computing space. See Exhibit U.

219.     On March 19, 2015, the attorney for Dr. Cabi, Dr. Cakir, and Dr. Mert sent the attached litigation hold letter to the attorney for Children's Hospital. To date, she has not responded to this litigation hold letter. See Exhibit V.

220.     Separately, Dr. Cabi and Dr. Cakir voluntarily allowed an outside vendor (TechFusion) to make images of their personal laptops because they sometimes used their personal laptops to do research related work and Children's Hospital wanted to see these files. Dr. Cabi and Dr. Cakir authorized TechFusion to do forensic investigation of research files.

221.     Children's Hospital repeatedly tried to gain access to Dr. Cabi's and Dr. Cakir's *personal files* on these personal laptop images.

222.     Luckily for Dr. Cabi and Dr. Cakir, the outside vendor, TechFusion, showed integrity and did not allow Children's Hospital to access their personal information.

223.     Its intellectual property policy in place until January 20, 2015, governs what materials Children's Hospital owns.

224.     Children's Hospital's counsel has admitted it does not have a right to access personal information of Dr. Cabi and Dr. Cakir.

225.     Children's Hospital now wishes to have Dr. Cabi's and Dr. Cakir's personal laptop images sent to a different outside vendor.

226.     Children's Hospital refused to pay TechFusion an outstanding invoice of almost a quarter million dollars for work that TechFusion performed at its direction.

227.     Children's Hospital has represented to TechFusion that it would pay the entire invoice if TechFusion permitted it to access personal information of Dr. Cabi and Dr. Cakir.

## VII.    Damages

228.     Dr. Ozcan, Dr. Majzoub, and Children's Hospital have eliminated for Dr. Cabi, Dr. Cakir, and Dr. Mert all their work as post-doctoral fellows in Dr. Ozcan's laboratory. At the time of filing this complaint, Dr. Cabi, Dr. Cakir, and Dr. Mert have collectively spent approximately 10-11 years in Dr. Ozcan's laboratory and 13-14 years at Children's Hospital.

229.     After the amount of time they spent as post-doctoral fellows in Dr. Ozcan's laboratory at a prestigious institution, Dr. Cabi and Dr. Cakir should be pursuing and obtaining assistant professor positions at this time, along with commensurate salary, benefits, and laboratory access. Instead, because their publication and patent record has been so harmed, Dr. Cabi and Dr. Cakir need to redo their entire post-doctoral study so that they will have the publications, recommendation letters, and patents necessary so as to pursue these positions. Dr. Mert has lost a corresponding amount of time in his career.

230.     Dr. Cabi, Dr. Cakir, and Dr. Mert had to work in an environment in Dr. Ozcan's laboratory where extreme cursing, racist, sexist, and sexual comments were common, personal choices (like not drinking alcohol) were not respected and but instead mocked, and threats pervaded. Dr. Ozcan created

a hostile work environment, limited their interaction with the scientific community, threatened to retaliate against them if they did not commit research misconduct, and did retaliate against them when they reported his research misconduct.

231.    Dr. Cabi and Dr. Cakir felt compelled to participate in their supervisor's misuse of federal resources for his personal company and use their bank accounts for his apparent money laundering.

232.    Despite its non-retaliation policy and federal law, Children's Hospital decided to remove Dr. Cabi and Dr. Cakir from projects, rightful inventorship of two patents, and authorship of at least one manuscript, and on information and belief a second manuscript, without any legitimate reason and against their objections. Dr. Cabi and Dr. Cakir have been prevented from authoring additional papers.

233.    Despite its non-retaliation policy, Children's Hospital decided to remove Dr. Mert from projects, and authorship of at least one manuscript, and on information and belief a second manuscript, without any legitimate reason and against his objection. Moreover, Dr. Mert has been prevented from publishing his Ph.D. thesis and authoring additional papers.

234.    Despite its non-retaliation policy, Children's Hospital terminated Dr. Cabi and Dr. Mert.

235.    Children's Hospital violated or otherwise failed to follow its own policies and procedures in its treatment of Dr. Cabi, Dr. Cakir, and Dr. Mert.

236.    Selective treatment of Dr. Cabi, Dr. Cakir, and Dr. Mert was motivated by an intention to inhibit their exercise or enjoyment of constitutional rights.

237.    Even though Dr. Cabi, Dr. Cakir, and Dr. Mert reported explicit research problems in Dr. Ozcan's version of the SR01 Manuscript and there is an ongoing scientific misconduct inquiry being conducted by a Harvard Medical School committee concerning this very topic, Children's Hospital and Dr. Ozcan decided to publish Dr. Ozcan's version of the SR01 Manuscript. This decision circumvented the Harvard Medical School committee and its investigation as required by federal law.

238.    The conduct described in the preceding paragraphs has ruined a collective fourteen years of work where Dr. Cabi, Dr. Cakir, and Dr. Mert were expected to work seven days a week. Dr. Cabi, Dr. Cakir, and Dr. Mert now have to start from scratch to have a remote chance of an academic career because of the large gap created by the Defendants in their curricula vitae.

239.    The conduct described in the preceding paragraphs has forced on Dr. Cabi, Dr. Cakir, and Dr. Mert tremendous psychological pain since the dates they joined Dr. Ozcan's laboratory and it has rendered them less productive since that time than they could have been.

240.    The conduct described in the preceding paragraphs has caused Dr. Cabi to depend on sleep medications and it has made him, and continues to make him, increasingly worried and depressed about his future career. Dr. Cabi has been very depressed that he will not be able to find an academic position, has been removed from projects on which he had worked for years, has or will be removed from inventorship on the Patents, and has been prevented from publishing his research, all because he reported the misconduct of his supervisor, Dr. Ozcan.

241.    Throughout the time they worked under Dr. Ozcan's supervision, Dr. Cabi's, Dr. Cakir's, and Dr. Mert's productivity at work was significantly diminished due to his continuous harassment, cursing, threats, and humiliation.

242.    Dr. Ozcan did not allow Dr. Cabi and Dr. Cakir to work on several research ideas they had

developed, specifically ones related to a third patent, and after the removal of Dr. Cabi and Dr. Cakir from the laboratory Dr. Ozcan claimed that these were his ideas.

243.    The conduct described in the preceding paragraphs has significantly damaged Dr. Cakir. The harm inflicted to his mental state has caused other individuals, including Dr. Herrema, to state their concern about him on numerous occasions. Dr. Herrema told Dr. Cakir that she was extremely worried that she was going to go through a similar nightmare when she started writing her manuscript with Dr. Ozcan. Dr. Herrema in September 2014 left Dr. Ozcan's laboratory and returned to her home country.

244.    Dr. Cakir has difficulty falling asleep as he constantly thinks about the conduct described in the preceding paragraphs. When he does fall asleep, he often sleeps for no more than 3-4 hours, and then wakes up in the middle of the night and starts thinking about the problems related to his career and life caused by Dr. Ozcan, Dr. Majzoub, and Children's Hospital. Dr. Cakir has been very depressed that he will not be able to find an academic position, has been removed from projects on which he had worked for years, has or will be removed from inventorship on the Patents, and has been prevented from publishing his research, all because he reported the misconduct of his supervisor, Dr. Ozcan.

245.    Because Dr. Cabi, Dr. Cakir, and Dr. Mert have to start over in new postdoctoral positions, Dr. Cabi and Dr. Cakir have lost all chances of applying for prestigious grants and fellowships at this time and Dr. Mert has lost most of his chances to do so. Such grants are important criteria universities consider when weighing applications for assistant professorship positions.

246.    Other individuals have noted and commented upon the harm inflicted to Dr. Mert's mental state because of the conduct described in the preceding paragraphs. Dr. Mert has had difficulty falling asleep as he constantly thinks about his situation. Dr. Mert has suffered from depression concerning his academic future, that he will not be able to find an academic position, has been removed from projects on which he had worked for years, and has been prevented from publishing his research, all because he reported the misconduct of his supervisor, Dr. Ozcan.

247.    Not being able to publish the results of their research has caused irreparable harm to the careers of Dr. Cabi, Dr. Cakir, and Dr. Mert.

248.    Dr. Cabi, Dr. Cakir, and Dr. Mert have been removed from authorship of the SR01 Manuscript and on information and belief from authorship of the SR02 Manuscript. Dr. Mert has not been allowed by Dr. Ozcan to publish the results of his dissertation research which is increasingly growing stale.

249.    Dr. Cabi has been removed from Dr. Wong's laboratory.

250.    As a result of the Defendants' actions and conduct, Dr. Cabi, Dr. Cakir, and Dr. Mert lost their long-term jobs, their scientific reputation, and the fruits of their scientific research. They have each suffered great emotional distress and other economic and non-economic harm.

251.    Even if Dr. Cabi, Dr. Cakir, and Dr. Mert successfully repeat their post-doctoral fellowships, the gaps on their curriculum vitae will always harm their academic reputations.

252.    It is for the Harvard Medical School committee to which reference is made in paragraph __ above to determine whether Dr. Ozcan committed research misconduct. The outcome of that determination is immaterial to whether Dr. Cabi, Dr. Cakir, and Dr. Mert suffered retaliation.

253.    Children's Hospital has a noble mission. However, even at noble institutions, personnel sometimes act wrongly and the law, as well as justice, requires redress.

254.    By reporting what they felt to be research misconduct and other inappropriate behavior by Dr. Ozcan, Dr. Cabi, Dr. Cakir, and Dr. Mert tried to protect scientific integrity as well as their reputation and that of Children's Hospital and Harvard Medical School. The above allegations show that they did so at the expense of their own academic careers.

## CLAIMS FOR RELIEF

### COUNT I
**Violation of First Amendment and 42 U.S.C. § 1983 Rights (Against Children's Hospital, Dr. Ozcan, and Dr. Majzoub)**

255.    Dr. Cabi, Dr. Cakir, and Dr. Mert re-allege and incorporate their allegations contained in paragraphs 1 through 254 inclusive of this Complaint as though the same had been set forth fully herein.

256.    Dr. Cabi, Dr. Cakir, and Dr. Mert complained about, among other things, Dr. Ozcan's creation of a hostile workplace, his research misconduct, and his misuse of federal funds, and they suffered retaliation for this protected speech.

257.    Dr. Cabi, Dr. Cakir, and Dr. Mert have suffered damages directly and proximately caused by the violations of Children's Hospital, Dr. Ozcan, and Dr. Majzoub as well as attorney's fees and court costs and they seek recovery with interest thereon as available at law.

258.    WHEREFORE, Plaintiffs hereby demand judgment by this Court against Children's Hospital, Dr. Ozcan, and Dr. Majzoub in an amount which is adequate to compensate them for their damages together with interest, costs, and attorney's fees.

### COUNT II
**Violation of Fourteenth Amendment and 42 U.S.C. § 1983 Rights (Against Children's Hospital, Dr. Ozcan, and Dr. Majzoub)**

259.    Dr. Cabi, Dr. Cakir, and Dr. Mert re-allege and incorporate their allegations contained in paragraphs 1 through 258 inclusive of this Complaint as though the same had been set forth fully herein.

260.    Children's Hospital, Dr. Ozcan, and Dr. Majzoub, acting under color of law, deprived Dr. Cabi, Dr. Cakir, and Dr. Mert of rights, privileges, immunities, and property interests secured by the Fourteenth Amendment and 42 U.S.C. § 1983.

261.    Dr. Cabi, Dr. Cakir, and Dr. Mert have suffered damages directly and proximately caused by the violations of Children's Hospital, Dr. Ozcan, and Dr. Majzoub as well as attorney's fees and court costs and they seek recovery with interest thereon as available at law.

262.    WHEREFORE, Plaintiffs hereby demand judgment by this Court against Children's Hospital, Dr. Ozcan, and Dr. Majzoub in an amount which is adequate to compensate them for their damages

together with interest, costs, and attorney's fees.

## COUNT III
## Violation of M.G.L. c. 12, §§ 11H and 11I (Against Children's Hospital, Dr. Ozcan, and Dr. Majzoub)

263.     Dr. Cabi, Dr. Cakir, and Dr. Mert re-allege and incorporate their allegations contained in paragraphs 1 through 262 inclusive of this Complaint as though the same had been set forth fully herein.

264.     Children's Hospital, Dr. Ozcan, and Dr. Majzoub interfered by threats, intimidation or coercion, or attempted to interfere by threats, intimidation or coercion, with the exercise or enjoyment by Dr. Cabi, Dr. Cakir, and Dr. Mert of rights secured by the Constitution or laws of the United States, and of rights secured by the Constitution or laws of Massachusetts.

265.     Dr. Cabi, Dr. Cakir, and Dr. Mert have suffered damages directly and proximately caused by the violations of Children's Hospital, Dr. Ozcan, and Dr. Majzoub as well as attorney's fees and court costs and they seek recovery with interest thereon as available at law.

266.     WHEREFORE, Plaintiffs hereby demand judgment by this Court against Children's Hospital, Dr. Ozcan, and Dr. Majzoub in an amount which is adequate to compensate them for their damages together with interest, costs, and attorney's fees.

## COUNT IV
## Hostile Work Environment (Against Children's Hospital and Dr. Ozcan)

267.     Dr. Cabi, Dr. Cakir, and Dr. Mert re-allege and incorporate their allegations contained in paragraphs 1 through 266 inclusive of this Complaint as though the same had been set forth fully herein.

268.     In violation of Title VII of the Civil Rights Act of 1964, Dr. Cabi, Dr. Cakir, and Dr. Mert were subjected to racial and sexual slurs, insults, jokes, and other unwanted and unwelcome conduct that was sufficiently severe or pervasive to alter the conditions of their employment and create an abusive or hostile work environment such that they perceived the working environment to be abusive or hostile and so would a reasonable person in their circumstances.

269.     Dr. Cabi, Dr. Cakir, and Dr. Mert have suffered damages directly and proximately caused by the violations of Children's Hospital and Dr. Ozcan as well as attorney's fees and court costs and they seek recovery with interest thereon as available at law.

270.     WHEREFORE, Plaintiffs hereby demand judgment by this Court against Children's Hospital and Dr. Ozcan in an amount which is adequate to compensate them for their damages together with interest, costs, and attorney's fees.

## COUNT V
## Violation of M.G.L. c. 151B (Against Children's Hospital and Dr. Ozcan)

271.    Dr. Cabi, Dr. Cakir, and Dr. Mert re-allege and incorporate their allegations contained in paragraphs 1 through 270 inclusive of this Complaint as though the same had been set forth fully herein.

272.    In violation of M.G.L. c. 151B, Dr. Cabi, Dr. Cakir, and Dr. Mert were subjected to racial and sexual slurs, insults, jokes, and other unwanted and unwelcome conduct that was sufficiently severe or pervasive to alter the conditions of their employment and create an abusive or hostile work environment where they perceived the working environment to be abusive or hostile and so would a reasonable person in their circumstances.

273.    Children's Hospital and Dr. Ozcan interfered with the exercise by Dr. Cabi, Dr. Cakir, and Dr. Mert of their enjoyment of rights granted or protected by M.G.L. c. 151B

274.    Children's Hospital and Dr. Ozcan discharged, expelled or otherwise discriminated against Dr. Cabi, Dr. Cakir, and Dr. Mert because they opposed practices forbidden under M.G.L. 151B and because they filed a complaint.

275.    Children's Hospital and Dr. Ozcan violated M.G.L. c. 151B by retaliating against Dr. Cabi, Dr. Cakir, and Dr. Mert for reporting practices that violated M.G.L. c. 151B.

276.    Dr. Cabi, Dr. Cakir, and Dr. Mert have suffered damages directly and proximately caused by the violations of Children's Hospital and Dr. Ozcan as well as attorney's fees and court costs and they seek recovery with interest thereon as available at law.

277.    WHEREFORE, Plaintiffs hereby demand judgment by this Court against Children's Hospital and Dr. Ozcan in an amount which is adequate to compensate them for their damages together with interest, costs, and attorney's fees.

## COUNT VI
## Retaliation (Against Children's Hospital, Dr. Ozcan, and Dr. Majzoub)

278.    Dr. Cabi, Dr. Cakir, and Dr. Mert re-allege and incorporate their allegations contained in paragraphs 1 through 277 inclusive of this Complaint as though the same had been set forth fully herein.

279.    Dr. Cabi, Dr. Cakir, and Dr. Mert engaged in activity protected under federal and Massachusetts law and Children's Hospital, Dr. Ozcan, and Dr. Majzoub each subjected them to adverse employment actions because of this activity.

280.    Children's Hospital, Dr. Ozcan, and Dr. Majzoub retaliated against Dr. Cabi, Dr. Cakir, and Dr. Mert in violation of, without limitation, the First Amendment, 42 U.S.C. § 1981, 42 U.S.C. § 1983, 42 U.S.C. 2000e-3(a), 42 U.S.C. § 289b(e), 42 CFR 93, M.G.L. c. 149 § 185, and M.G.L. c. 151B.

281.    Children's Hospital permitted or otherwise did fail to prevent Dr. Ozcan from retaliating against

24

Dr. Cabi, Dr. Cakir, and Dr. Mert.

282.    Dr. Cabi, Dr. Cakir, and Dr. Mert have suffered damages directly and proximately caused by the violations of Children's Hospital, Dr. Ozcan, and Dr. Majzoub as well as attorney's fees and court costs and they seek recovery with interest thereon as available at law.

283.    WHEREFORE, Plaintiffs hereby demand judgment by this Court against Children's Hospital, Dr. Ozcan, and Dr. Majzoub in an amount which is adequate to compensate them for their damages together with interest, costs, and attorney's fees.

## COUNT VII
### Negligence (Against Children's Hospital and Dr. Majzoub)

284.    Dr. Cabi, Dr. Cakir, and Dr. Mert re-allege and incorporate their allegations contained in paragraphs 1 through 283 inclusive of this Complaint as though the same had been set forth fully herein.

285.    Children's Hospital and Dr. Majzoub were negligent in supervising Dr. Ozcan, reviewing Dr. Ozcan's activities, investigating when they knew or should have known about Dr. Ozcan's misconduct, taking necessary measures as to complaints made about Dr. Ozcan by his laboratory members, and failing to act adequately when they knew or should have known about Dr. Ozcan's misconduct.

286.    Dr. Cabi, Dr. Cakir, and Dr. Mert have suffered damages directly and proximately caused by the violations of Children's Hospital and Dr. Majzoub as well as attorney's fees and court costs and they seek recovery with interest thereon as available at law.

287.    WHEREFORE, Plaintiffs hereby demand judgment by this Court against Children's Hospital and Dr. Majzoub in an amount which is adequate to compensate them for their damages together with interest, costs, and attorney's fees.

## COUNT VIII
### Correction of named inventors on the SR01 and SR02 patents pursuant to 35 U.S.C. § 256 (b) (Against Children's Hospital)

288.    Dr. Cabi and Dr. Cakir re-allege and incorporate their allegations contained in paragraphs 1 through 287 inclusive of this Complaint as though the same had been set forth fully herein.

289.    Pursuant to 35 U.S.C. §116 Dr. Cabi and Dr. Cakir are inventors on the SR01 and SR02 patents.

290.    Dr. Cabi and Dr. Cakir each contributed in some significant manner to the conception or reduction to practice of the SR01 and SR02 inventions and they each made a contribution to the SR01 and SR02 inventions that are not insignificant in quality when that contribution is measured against the dimension of the full invention.

291.    Children's Hospital has indicated that it has already removed Dr. Cabi and Dr. Cakir from inventorship on the SR01 and SR02 patents or that it plans to take steps to do so.

25

292.    Dr. Cabi and Dr. Cakir hereby seek correction of inventorship pursuant to 35 U.S.C. § 256 (b) on the SR01 and SR02 patents to include each of them as inventors on both.

293.    WHEREFORE, Dr. Cabi and Dr. Cakir hereby ask this Court to order correction of inventorship and award them an amount which is adequate to compensate them for their damages together with interest, costs, and attorney's fees.

## COUNT IX
### Spoliation (Against Children's Hospital, Dr. Ozcan, and Dr. Majzoub)

294.    Dr. Cabi, Dr. Cakir, and Dr. Mert re-allege and incorporate their allegations contained in paragraphs 1 through 293 inclusive of this Complaint as though the same had been set forth fully herein.

295.    Since at least March 2014, Children Hospital, Dr. Ozcan, and Dr. Majzoub had a legal duty not to destroy evidence related to complaints made by, and potential claims by, Dr. Cabi, Dr. Cakir, and Dr. Mert.

296.    Children's Hospital, Dr. Ozcan, and Dr. Majzoub breached their duty, individually or in concert, either intentionally, recklessly, or negligently.

297.    Children's Hospital failed to promptly take all reasonable and practical steps to obtain custody of all the research records and evidence needed to conduct the research misconduct proceeding, inventory the records and evidence, and sequester them in a secure manner, in violation of 42 CFR 93.305.

298.    These breaches materially impact the ability of Dr. Cabi, Dr. Cakir, and Dr. Mert to present their case and establish above-alleged facts, including as to inventorship on patents.

299.    These breaches materially impact the ability of the HMS committee to conduct adequately its research misconduct investigation.

300.    These breaches directly and proximately cause damage to Dr. Cabi, Dr. Cakir, and Dr. Mert, including as to the impact on their ability to prove their claims and assertions and obtain full restitution for their damages.

301.    Dr. Cabi, Dr. Cakir, and Dr. Mert have suffered damages directly and proximately caused by the spoliation committed by Children's Hospital, Dr. Ozcan, and Dr. Majzoub as well as attorney's fees and court costs and they seek recovery with interest thereon as available at law.

302.    WHEREFORE, Plaintiffs hereby demand judgment by this Court against Children's Hospital, Dr. Ozcan, and Dr. Majzoub in an amount which is adequate to compensate them for their damages together with interest, costs, and attorney's fees and such other orders and sanctions as this Court deems just, including but not limited to preclusion of affirmative defenses, a spoliation jury instruction, and other appropriate sanctions.

## COUNT X
### Conspiracy (Against All Defendants)

303.    Dr. Cabi, Dr. Cakir, and Dr. Mert re-allege and incorporate their allegations contained in paragraphs 1 through 302 inclusive of this Complaint as though the same had been set forth fully herein.

304.    Defendants are parties to a conspiracy, including but not limited to a conspiracy in violation of 42 U.S.C. § 1985.

305.    Each of the Defendants has, to varying degrees, participated in planning and carrying out the objectives of the conspiracy and all are liable for the concerted actions of their co-conspirators.

306.    The objects of the conspiracy have been to deprive Dr. Cabi, Dr. Cakir, and Dr. Mert of their protected rights, privileges, immunities, and property; to intimidate and retaliate against them because of the complaints they made about Dr. Ozcan's misconduct; and to benefit Children's Hospital, Dr. Ozcan, Dr. Majzoub, and ERX.

307.    The conspiracy has included spoliation of evidence.

308.    Dr. Cabi, Dr. Cakir, and Dr. Mert have suffered damages directly and proximately caused by the conspiracy as well as attorney's fees and court costs and they seek recovery with interest thereon as available at law.

309.    WHEREFORE, Plaintiffs hereby demand judgment by this Court against Defendants in an amount which is adequate to compensate them for their damages together with interest, costs, and attorney's fees.

## COUNT XI
### Breach of contract (Against Children's Hospital)

310.    Dr. Cabi, Dr. Cakir, and Dr. Mert re-allege and incorporate their allegations contained in paragraphs 1 through 309 inclusive of this Complaint as though the same had been set forth fully herein.

311.    Children's Hospital entered into agreements with Dr. Cabi, Dr. Cakir, and Dr. Mert regarding the terms and conditions of their employment, including a research misconduct policy that included non-retaliation for whistleblowers.

312.    Children's Hospital entered into agreements with Dr. Cabi, Dr. Cakir, and Dr. Mert regarding finding them new laboratories at which to work.

313.    Children's Hospital entered into agreements with Dr. Cabi and Dr. Mert to employ them until June 19, 2015, and pay miscellaneous expenses.

314.    Children's Hospital breached its agreements, including but not limited to the agreements with Dr. Cabi and Mert regarding their employment.

315.     Children's Hospital breached its agreements, including but not limited to the agreements with Dr. Cabi, Dr. Cakir, and Dr. Mert regarding the terms and conditions of their employment, including a research misconduct policy that included non-retaliation for whistleblowers.

316.     Children's Hospital breached its agreements, including but not limited to the agreements with Dr. Cabi, Dr. Cakir, and Dr. Mert regarding finding them new laboratories at which to work.

317.     Dr. Cabi, Dr. Cakir, and Dr. Mert have suffered damages directly and proximately caused by the breaches by Children's Hospital as well as attorney's fees and court costs and they seek recovery with interest thereon as available at law.

318.     WHEREFORE, Plaintiffs hereby demand judgment by this Court against Children's Hospital in an amount which is adequate to compensate them for their damages together with interest, costs, and attorney's fees.

## COUNT XII
### Misrepresentation (Against Children's Hospital)

319.     Dr. Cabi, Dr. Cakir, and Dr. Mert re-allege and incorporate their allegations contained in paragraphs 1 through 318 inclusive of this Complaint as though the same had been set forth fully herein.

320.     Children's Hospital made false representations to Dr. Cabi, Dr. Cakir, and Dr. Mert and it did so negligently or intentionally.

321.     Children's Hospital made false representations to Dr. Cabi, Dr. Cakir, and Dr. Mert to induce them to rely on them.

322.     Dr. Cabi, Dr. Cakir, and Dr. Mert believed Children's Hospital's false representations and relied on them.

323.     Dr. Cabi, Dr. Cakir, and Dr. Mert have suffered damages directly and proximately caused by the misrepresentations of Children's Hospital as well as attorney's fees and court costs and they seek recovery with interest thereon as available at law.

324.     WHEREFORE, Plaintiffs hereby demand judgment by this Court against Children's Hospital in an amount which is adequate to compensate them for their damages together with interest, costs, and attorney's fees.

## COUNT XIII
### Intentional or reckless infliction of emotional distress
### (Against Children's Hospital, Dr. Ozcan, and Dr. Majzoub)

325.     Dr. Cabi, Dr. Cakir, and Dr. Mert re-allege and incorporate their allegations contained in paragraphs 1 through 324 inclusive of this Complaint as though the same had been set forth fully herein.

326.    Defendants are liable for intentional or reckless infliction of emotional distress upon Dr. Cabi, Dr. Cakir, and Dr. Mert.

327.    The injuries sustained by Dr. Cabi, Dr. Cakir, and Dr. Mert are the direct and proximate result of Defendants intentional or reckless infliction of emotional distress upon them.

328.    As a result of Defendants' intentional or reckless infliction of emotional distress upon them, Dr. Cabi, Dr. Cakir, and Dr. Mert have suffered, and continue to suffer, substantial damages including but not limited to depression, humiliation, intense anxiety and sleep deprivation.

329.    As a direct and proximate result, Dr. Cabi, Dr. Cakir, and Dr. Mert have accrued damages as well as attorney's fees and court costs for which they seek recovery with interest thereon as available by law.

330.    WHEREFORE, Plaintiffs hereby demand judgment by this Court against all Defendants in an amount which is adequate to compensate them for their damages together with interest, costs, and attorney's fees.

## COUNT XIV
### Negligent infliction of emotional distress
### (Against Children's Hospital, Dr. Ozcan, and Dr. Majzoub)

331.    Dr. Cabi, Dr. Cakir, and Dr. Mert re-allege and incorporate their allegations contained in paragraphs 1 through 330 inclusive of this Complaint as though the same had been set forth fully herein.

332.    Defendants are liable for negligent infliction of emotional distress upon Dr. Cabi, Dr. Cakir, and Dr. Mert.

333.    The injuries sustained by Dr. Cabi, Dr. Cakir, and Dr. Mert are the direct and proximate result of Defendants negligent infliction of emotional distress upon them.

334.    As a result of Defendants' negligent infliction of emotional distress upon them, Dr. Cabi, Dr. Cakir, and Dr. Mert have suffered, and continue to suffer, substantial damages including but not limited to depression, humiliation, intense anxiety and sleep deprivation.

335.    As a direct and proximate result, Dr. Cabi, Dr. Cakir, and Dr. Mert have accrued damages as well as attorney's fees and court costs for which they seek recovery with interest thereon as available by law.

336.    WHEREFORE, Plaintiffs hereby demand judgment by this Court against all Defendants in an amount which is adequate to compensate them for their damages together with interest, costs, and attorney's fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

1.  Award appropriate compensatory damages, including multiple, consequential, and punitive damages, in an amount determined at trial, exclusive of interest;

2.  Order appropriate declaratory relief regarding the unconstitutional and unlawful acts and practices of Defendants;

3.  Order appropriate equitable relief against Defendants as allowed by 42 U.S.C. § 1983, including the enjoining and permanent restraining of violations, and direction to Defendants to take such affirmative action as is necessary to ensure that the effects of the unconstitutional and unlawful practices are eliminated and do not continue to affect Plaintiffs', or others', employment opportunities;

4.  Order correction of inventorship on the SR01 and SR02 patents;

5.  Order retraction of the SR01 Manuscript, and a stay of submission or publication of the SR02 Manuscript, pending the outcome of the investigation of the Harvard Medical School committee referenced in Paragraph 38, including as to correcting authorship;

6.  Award attorney's fees, costs, and disbursements of this action pursuant to 42 U.S.C. § 1988, M.G.L. c. 12 §11I, M.G.L. c. 151B, and M.G.L. c. 149 § 185, and as otherwise provided by law; and,

7.  Order such other further relief, including orders and award, as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs request a jury trial.

Respectfully submitted,
SERKAN CABI, Ph.D., ISIN CAKIR, Ph.D.,
and SAFAK MERT, Ph.D.
By their attorneys,

/s/ Christian G. Samito
Christian G. Samito, BBO# 639825
Samito Law, LLC
15 Broad Street, Suite 800
Boston, MA 02109
(617) 523-0144 (telephone)
Christian@samitolaw.com
Date:   June 11, 2015                          www.samitolaw.com