# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| ) | |
| SERKAN CABI, Ph.D., ISIN CAKIR, Ph.D. ) | |
| and SAFAK MERT, Ph.D., ) | |
| Plaintiffs, ) | |
| v. ) | Civil Action No.  15-cv-12306 |
| ) | |
| BOSTON CHILDREN'S HOSPITAL, ) | |
| THE CHILDREN'S HOSPITAL CORPORATION ) | |
| AND ITS AFFILIATED ENTITIES, UMUT ) | |
| OZCAN, M.D., JOSEPH MAJZOUB, M.D., ) | |
| SANDRA L. FENWICK, MICHELE GARVIN ) | |
| and ERX PHARMACEUTICALS, INC., ) | |
| Defendants. ) | |
| _____) | |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                    **February 12, 2016**

## I.    Introduction

Plaintiffs Serkan Cabi, Isin Cakir and Safak Mert (individually, "Cabi," "Cakir" and "Mert"; collectively "Plaintiffs") have filed this lawsuit against Defendants Boston Children's Hospital, the Children's Hospital Corporation and its Affiliated Entities, Umut Ozcan, Joseph Majzoub, Sandra Fenwick, Michele Garvin and ERX Pharmaceuticals, Inc. (individually "BCH," "Ozcan," "Majzoub," "Fenwick," "Garvin" and "ERX"; collectively, "Defendants") alleging violations of 42 U.S. C. § 1983 for constitutional claims, Mass. Gen. L. c. 12 §§ 11H and 11I, Title VII, Mass. Gen. L. c. 151B and 42 U.S.C. § 1985.  D. 33.  Plaintiffs also allege retaliation in violation of multiple statutes, breach of contract and misrepresentation.  Id.  In separate motions, Defendants have moved to dismiss.  D. 38; D. 40; D. 44.  For the reasons stated below, the Court DENIES in part and GRANTS in part the motions.

## II.    Standard of Review

On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6), the Court must determine if the facts alleged "plausibly narrate a claim for relief." Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012) (internal citation omitted).  The Court conducts a two-step, context-specific inquiry. See García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013).  First, the Court must perform a close reading of the complaint "as a whole" to distinguish the factual allegations from the conclusory legal allegations contained therein.  Id.  The Court must accept the factual allegations as true.  Id.  Conclusory legal assertions may be disregarded.  Id.  Second, the Court must determine whether the factual allegations present a "reasonable inference that the defendant is liable for the conduct alleged."  Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011) (internal quotation marks and citation omitted).

To survive a motion to dismiss, the complaint must provide sufficient factual allegations to render the claims "plausible on [the] face [of the complaint]."  García-Catalán, 734 F.3d at 103.  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  Iqbal, 556 U.S. at 679 (quoting Twombly, 550 U.S. at 557) (alteration in original).  "In determining whether a [pleading] crosses the plausibility threshold, 'the reviewing court [must] draw on its judicial experience and common sense.'"  Garcia-Catalan, 734 F.3d at 103 (quoting Iqbal, 556 U.S. at 679).  The Court notes that "[t]his context-specific inquiry does not demand 'a high degree of factual specificity.'"  García-Catalán, 734 F.3d at 103 (internal citations omitted).

### III.     Factual Background

The following summary is based upon the factual allegations in the complaint, which exceeds 300 single-spaced paragraphs and contains nearly 400 pages of exhibits and which the Court must accept as true for the purpose of considering Defendants' motions to dismiss.

#### A.     The Parties

Plaintiffs are post-doctoral fellows who worked in Ozcan's laboratory at BCH.  D. 33 ¶ 1.  Ozcan is a principal investigator and supervisor at BCH.  Id. ¶¶ 5-6.  Majzoub is Ozcan's Division Chief at BCH.  Id. ¶ 11.  Fenwick is the President and Chief Executive Officer at BCH.  Id. ¶ 12.  Garvin is Senior Vice President and General Counsel at BCH.  Id. ¶ 13.  Ozcan is also a director at ERX, a corporate entity separate from BCH.  Id. ¶ 9.  Through ERX, Ozcan hopes to market the results of research performed at his laboratory.  Id. ¶ 10.  While working in Ozcan's laboratory, Plaintiffs conducted research on the biology of obesity and diabetes with the goal of developing drugs to prevent those conditions.  Id. ¶ 22.  Plaintiffs allege that Cakir and Cabi worked on two patent applications related to the anti-obesity and diabetes research:   (1) Application PCT/US2013/061911 ("SR01") and (2) Application 61/908,998 ("SR02").  Id. ¶¶ 57, 59.  Cabi and Cakir were at one point considered inventors on the SR01 and SR02 patents.  Id. ¶¶ 59-61, 67, 72, 78.  Cabi, Cakir and Mert contributed to manuscripts concerning SR01 ("SR01 manuscript") and SR02 ("SR02 manuscript").  Id. ¶¶ 61, 82-90, 99-111.

#### B.     Ozcan's Research Related Misconduct

Plaintiffs allege that Ozcan fabricated research results and forced Plaintiffs to fabricate research results under the threat of retaliation.  Id. ¶¶ 29, 33-35, 132, 142-43.  Plaintiffs allege that Ozcan conducted research misconduct in scientific manuscripts, federal grant applications and scientific meeting presentations.  Id.  Plaintiffs allege that Ozcan's fabricated data was used

in the SR01 manuscript and the SR02 manuscript.  Id. ¶ 83.  Ozcan demanded pre-determined results from certain experiments, regardless of the actual outcome.  Id. ¶ 132.  If Plaintiffs failed to provide the results Ozcan expected, he cursed, called them "idiot[s]" in front of other people and threatened, *inter alia*, termination of employment, cancelation of publications and withholding of letters of recommendation.  Id. ¶¶ 132, 143.  Plaintiffs further allege that Ozcan forced them to conduct research for ERX using BCH and federal funding under the threat of retaliation.  Id. ¶¶ 33-35, 160-62.

### C.      Hostile Work Environment in Ozcan's Laboratory

Plaintiffs allege that Ozcan created a hostile work environment through a litany of racist, sexist and sexual comments made over several years beginning in 2011.  Id. ¶¶ 124-157, 230.  Despite knowing that Plaintiffs' mothers were Turkish, Ozcan made offensive statements regarding Turkish people.  Id. ¶ 141.  According to Plaintiffs, in 2012, for example, Ozcan told Plaintiffs that all Turkish women are good for is "being fucked."  Id.  Ozcan made similar comments at other times.  Id.  Ozcan also repeatedly mocked Cakir's ethnic background in front of other people.  Id. ¶ 139.  Ozcan told Cakir that he looked as stupid and empty as a "Laz," a term that Plaintiffs allege is a reference to Cakir's ethnic background.  Id.; D. 73 at 22  Ozcan also told Cakir that Cakir was as stupid as a person from the Black Sea region, another reference to Cakir's ethnic background.  Id.  Ozcan frequently accused Mert of being a terrorist, including in front of other people.  Id. ¶ 146,  and made sexually inappropriate threats in Turkish on one occasion after asking Cabi and Cakir a scientific question.  Id. ¶ 138.  Plaintiffs describe such comments as routine.  Id.

Plaintiffs also allege that Ozcan made sexually explicit comments and derogatory comments towards African Americans and Mexicans.  Id. ¶¶ 124-157.  Plaintiffs allege that

Ozcan routinely told explicit sexual stories about his own life and Cabi's sexual life.  Id. ¶¶ 129-130.  According to Plaintiffs, Ozcan instructed Cakir to lie when interviewed by BCH regarding a sexual harassment complaint that a female researcher made against Ozcan.  Id. ¶ 133.

### D.    Plaintiffs' Reports of Ozcan's Misconduct

Plaintiffs allege that beginning in 2014, Cabi and Cakir sought the advice of management regarding the proper procedures for reporting Ozcan's misconduct.  Id. ¶¶ 30-32.  Plaintiffs allege that they were encouraged to report the misconduct and assured that they would be protected by BCH's non-retaliation policy.  Id. ¶¶ 30-32, 39-41.  On March 3 and 4, 2014, Plaintiffs made official reports of Ozcan's research misconduct and the hostile work environment in Ozcan's laboratory.  Id. ¶¶ 33-35.  In response, BCH promised that it would open an investigation, assign Plaintiffs an independent senior professor for supervision and assign Plaintiffs to a new laboratory.  Id. ¶¶ 43, 55.

### E.    Retaliation

Plaintiffs allege that in the year prior to reporting Ozcan's misconduct, Cabi and Cakir received raises, Mert received a promotion and Ozcan publicly praised Cabi and Cakir.  Id. ¶¶ 23-28, 278.  Additionally, Ozcan recommended that Cabi and Cakir apply for fellowships and Majzoub offered to support their applications.  Id. ¶ 173.  Majzoub told Cabi and Cakir that he thought it was time for them to receive a promotion.  Id. ¶ 52.

Plaintiffs allege that this treatment changed after they reported Ozcan's misconduct. Plaintiffs allege that BCH, Ozcan and Majzoub, individually and collectively, cut Plaintiffs off from the laboratory and financial resources that Plaintiffs needed to continue conducting research.  Id. ¶¶ 167-168, 174-176, 178-185.  Plaintiffs also allege that BCH stripped Cabi and Cakir of inventorship rights on the SR01 and SR02 patents and stripped Plaintiffs of authorship

rights on the SR01 and SR02 manuscripts because Plaintiffs were unwilling to agree to the inclusion of data they knew to be fabricated.  Id. ¶¶ 115, 122, 170-171.  According to Plaintiffs, after they reported Ozcan's misconduct, Majzoub refused to support Cabi and Cakir's fellowship applications.  Id. ¶ 173.  Similarly, Ozcan prevented Mert's publication of research related to Mert's doctoral dissertation.  Id. ¶ 123.  Ozcan inappropriately contacted Cakir's principal investigator at Vanderbilt University where Cakir had already obtained a post-doctoral fellowship position.  Id. ¶¶ 189-190.  Plaintiffs further allege that a few months after they reported Ozcan's misconduct, Ozcan filed a false charge of research misconduct against Cabi and Cakir.  Id. ¶ 45.  BCH ultimately terminated Plaintiffs, jeopardizing Cabi and Mert's ability to remain in the United States given that they are on work visas.  Id. ¶¶ 17, 188, 193, 278.

### F.      Spoliation of Evidence by BCH and Ozcan

According to Plaintiffs, laboratory notebooks and documents related to the SR01 and SR02 patents have been destroyed, discarded or otherwise lost by Ozcan and/or BCH.  Id. ¶ 71. BCH failed to secure research materials including laboratory notebooks and computers that were in Ozcan's possession and were central to resolving the inventorship disputes related to the SR01 and SR02 patents' inventorship.  Id. ¶¶ 195-196.  Plaintiffs also allege that BCH has denied Cabi and Cakir access to information and reports that Plaintiffs are entitled to pursuant to 42 C.F.R. § 93.307(f).  Id. ¶¶ 49-51, 197-198.

## IV.    Procedural History

On or about December 29, 2014, Plaintiffs filed charges with the Massachusetts Commission Against Discrimination and the Equal Employment Opportunity Commission.  Id. ¶ 20.  On June 11, 2015, Plaintiffs instituted this action, D. 1, and subsequently filed an amended complaint.  D. 33  Ozcan, ERX, BCH, Fenwick, Garvin and Majzoub have now moved to

dismiss the amended complaint.  D. 38; D. 40; D. 44.  The Court heard the parties on the pending motions and took these matters under advisement.

## V.    Analysis

### A.    Defendants Are Entitled to Dismissal of Plaintiffs' 42 U.S.C. § 1983 Claims (Count I and II)

Plaintiffs asserts claims against BCH, Ozcan, Majzoub, Fenwick and Garvin for violations of Plaintiffs' First Amendment, Fifth Amendment and Fourteenth Amendment rights under 42 U.S.C. § 1983.  D. 33 ¶¶ 239-250.  The parties do not dispute that each of the Defendants named in these counts is a private actor.  Id. ¶¶ 239-242; D. 46 at 4-5.

#### 1.    Requirements for Section 1983 Claims against Private Parties

Section 1983 "provides a remedy for deprivations of rights secured by the Constitution and laws of the United States when that deprivation takes place 'under color of any statute, ordinance, regulation, custom, or usage, of any State.'"  Klunder v. Brown Univ., 778 F.3d 24, 30 (1st Cir. 2015) (citing Estades–Negroni v. CPC Hosp. San Juan Capestrano, 412 F.3d 1, 4 (1st Cir. 2005)).  As section 1983 does not apply to purely private action, Barrios-Velazquez v. Asociacion de Empleados del Estado Libre Asociado de Puerto Rico, 84 F.3d 487, 491 (1st Cir. 1996), the pivotal question "is whether the conduct at issue in this case may be fairly attributable to the State" such that section 1983's color of law requirement is satisfied.  Id. (internal quotation marks and citation omitted).

It is only the "rare circumstance[]" in which a private party can be deemed a state actor for section 1983 purposes.  Klunder, 778 F.3d at 30 (internal quotation marks and citations omitted). One of three tests must be satisfied:  (1) the state compulsion test, (2) the nexus/joint actor test, or (3) the public function test.  See Sanchez v. Pereira-Castillo, 590 F.3d 31, 51-52 (1st Cir. 2009).  Under the state compulsion test, private parties can be deemed state actors if the

7

state has "exercised coercive power or has provided such significant encouragement . . . that the [challenged conduct] must in law be deemed to be that of the State." Klunder, 778 F.3d at 30 (quoting Estades-Negroni, 412 F.3d at 5) (alternation in original) (internal quotation marks omitted).   Under the nexus/joint action test, private parties can be treated as state actors "where an examination of the totality of the circumstances reveals that the state has so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in [the challenged activity]." Id. at 31 (alteration in original) (internal quotation marks and citation omitted).   Finally, private parties who "performed a public function that has been traditionally the exclusive prerogative of the State" can be treated as state actors.  Id.  (internal quotation marks and citation omitted).

### 2.      Plaintiffs' Allegations Do Not Plausibly Satisfy Any of the Tests for Attributing Private Conduct to the State

#### a)      BCH's Conduct Cannot Be Attributed to the State

The Court considers whether Plaintiffs' relevant allegations satisfy any of the three tests. To address the state action requirement, Plaintiffs first point to their allegation that BCH received National Institute of Health funds.  D. 33 ¶ 8; D. 46 at 6.   Second, Plaintiffs point to their allegation that BCH is committed to promoting community health.   D. 46 at 5.   Third, Plaintiffs note that BCH acted in a "quasi-judicial investigatory and disciplinary capacity for the federal government" pursuant to 42 C.F.R. § 93.100 et seq..  D. 33 ¶ 241; D. 46 at 6.   Finally, Plaintiffs allege that "BCH collaborates with the Massachusetts Life Sciences Center, a quasi-public state agency, and other state and local government entities in pursuit of these endeavors." D. 33 ¶ 3.

Plaintiffs' allegations do not provide sufficient cause to attribute the conduct of BCH to the state under any of the applicable tests.  BCH's receipt of federal funding is not sufficient

cause to attribute BCH's conduct to the state because "it is well-settled . . . that receipt of federal funding does not render an entity a state actor for purposes of [section] 1983." Hoover v. Suffolk Univ. Law Sch., 27 F.3d 554, 1994 WL 251266, at *1 (1st Cir. 1994) (dismissing section 1983 claim because "[t]he only basis for state action . . . asserted was that [the defendant] receives federal funding"); see Rendell-Baker v. Kohn, 457 U.S. 830, 840 (1982) (determining that "the school's receipt of public funds does not make the discharge decisions acts of the State"); Rockwell v. Cape Cod Hosp., 26 F.3d 254, 258 (1st Cir. 1994) (stating that "the receipt of federal funds . . . are insufficient to establish that a hospital or other entity acted under color of state law").[1]

BCH's commitment to "promot[ing] the general health of the community[,]" D. 46 at 5, is not the kind of traditional state power that renders BCH's conduct attributable to the state. Although the state may engage in the promotion of community health, community health is not an "'exclusively' governmental" function. Rinsky v. Trustees of Boston Univ., No. 10-cv-10779-NG, 2010 WL 5437289, at *4 (D. Mass. Dec. 27, 2010) (explaining that "[a]lthough social workers perform a public service, their enterprise is hardly the exclusive domain of the state"). "[T]he provision of health services is not and has never been the exclusive province of the state." Estades-Negroni, 412 F.3d at 8 (rejecting the argument that defendants "are state actors under the public function test because they provided health services to indigents"). Similarly, Defendants' commitment to or involvement with scientific research does not satisfy the state action test because "[w]hile it is true that the federal government has engaged in substantial funding of scientific research, such research is by no means within the exclusive domain of government." Cohen v. President & Fellows of Harvard Coll., 568 F. Supp. 658, 661

---

[1] Similarly, collaboration with a "quasi-public" state agency such as the Massachusetts Life Sciences Center, D. 33 ¶ 3, without more is insufficient. Johnson v. Rodriguez, 943 F.2d 104, 108 (1st Cir. 1991) (dismissing section 1983 claim against state defendants).

(D. Mass. 1983) aff'd, 729 F.2d 59 (1st Cir. 1984) (dismissing section 1983 claim against university).

Plaintiffs also point to BCH's internal investigations and characterize the investigations as "a quasi-judicial investigatory and disciplinary capacity."  D. 33 ¶ 37; D. 46 at 6.  It is not uncommon for institutions to have internal disciplinary and other decision-making processes; those investigations rise neither to the level of a traditional state power nor to joint action so long as the state did not influence or coerce the private party's decision or encourage a particular outcome in any particular case.  See Berrios v. Inter Am. Univ., 535 F.2d 1330, 1332 (1st Cir. 1976) (dismissing section 1983 claim after finding, among other things, that the university's disciplinary proceedings were not fairly attributable to the state under any of the applicable tests); see also Estades-Negroni, 412 F.3d at 5 (rejecting argument that private hospital's procedure for determining an individual's civil commitment rendered the hospital a state actor). There is no allegation that BCH's investigation was influenced by the federal government. There is no allegation of specific government action during BCH's investigatory process.  Thus, the investigations do not render BCH's conduct attributable to the state.  See Cohen, 568 F. Supp. at 660-661 (granting dismissal where plaintiff was "unable to point to any specific 'actions of the government which in fact motivated the private action'"); see also Barrios-Velazquez, 84 F.3d at 492 (noting that "[a] private entity's conduct is not actionable under section 1983 if the challenged action results from the exercise of private choice and not from state influence or coercion").

For all of these reasons, Plaintiffs have failed to establish that BCH's actions can be attributed to the state.  Dismissal of this claim is warranted.

b)      *The Individual Defendants' Conduct Cannot Be Attributed to the State*

Plaintiffs argue that Ozcan, Majzoub, Fenwick and Garvin's alleged conduct can be attributed to the state because Ozcan, Majzoub, Fenwick and Garvin are employees of BCH and had direct decision-making responsibility over the alleged conduct of BCH upon which Plaintiffs rest this claim.  D. 46 at 8; D. 47 at 3.  Thus, in lodging this section 1983 claim against Ozcan, Majzoub, Fenwick and Garvin, Plaintiffs point to the very same alleged actions that Plaintiffs relied upon in asserting this claim against BCH.  For all of the same reasons the Court concluded that BCH's alleged actions were insufficient to establish that BCH acted under color of state law, the Court concludes that Ozcan, Majzoub, Fenwick and Garvin's alleged participation in BCH's actions is insufficient to establish that those individuals acted under color of state law.  As such, dismissal of this section 1983 claim against the individuals is warranted.  See e.g., Snyder v. Talbot, 836 F. Supp. 19, 21-22 (D. Me. 1993) (granting motion to dismiss section 1983 claim against individual defendant because "the [c]omplaint fail[ed] to allege facts sufficient to support a finding that [the] [d]efendant acted 'under color' of state law").

Contrary to Plaintiffs' suggestion, Bivens does not save Plaintiffs' claims.  Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 389 (1971).  Bivens is unavailable against private actors.  See Stoutt v. Banco Popular de Puerto Rico, 320 F.3d 26, 33 (1st Cir. 2003) (noting that "[t]he Supreme Court has already limited Bivens actions by refusing to extend them to private entities acting under color of federal law") (citing Corr. Servs. Corp. v. Malesko, 534 U.S. 61 (2001)).  In sum, because there is no plausible showing that Defendants' conduct can be attributed to the state, Plaintiffs' section 1983 claims must be dismissed.

**B.      Plaintiffs Have Adequately Stated Claims under Mass. Gen. L. c. 12 § 11I against BCH, Ozcan and Majzoub (Count III)**

Plaintiffs assert claims against BCH, Ozcan, Majzoub, Fenwick and Garvin for violations of the Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. L. c. 12 § 11I.  D. 33 ¶¶ 251-256.[2] Although the MCRA has similarities with 42 U.S.C. § 1983 and courts have described the MCRA as "coextensive" with section 1983, unlike section 1983, the MCRA does not require state action.  Redgrave, 399 Mass. at 98.  To raise a claim under the MCRA, a plaintiff must establish that (1) he experienced "threats, intimidation or coercion" (2) that interfered with or attempted to interfere with his exercise or enjoyment of rights secured by the Constitution or laws either of the United States or of the Commonwealth.  Bally v. Northeastern Univ., 403 Mass. 713, 717 (1989).

"Threat[s]" are "the intentional exertion of pressure to make another fearful or apprehensive of injury or harm." Planned Parenthood League of Mass., Inc. v. Blake, 417 Mass. 467, 474 (1994) (citing inter alia Delaney v. Chief of Police of Wareham, 27 Mass. App. Ct. 398, 409 (1989) (defining threats as "acts or language by which another is placed in fear of injury or damage")).  "'Intimidation' involves putting in fear for the purpose of compelling or deterring conduct."  Planned Parenthood, 417 Mass. at 474.  "[C]oercion" is "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done."  Id. (internal quotation marks and citation

---

[2]  Plaintiffs' pleadings invoke both Mass. Gen. L. c. 12 § 11I and Mass. Gen. L. c. 12 § 11H. Mass. Gen. L. c. 12 § 11H permits the attorney general to bring a civil action for equitable relief where any person employs threats, intimidation or coercion to interfere with or attempt to interfere with another person's exercise of rights secured by the laws of the United States or Massachusetts.  See Mass. Gen. L. c. 12 § 11H.  In turn, Mass. Gen. L. c. 12 § 11I provides a private cause of action for the conduct prohibited by Mass. Gen. L. c. 12 § 11H.  Mass. Gen. L. c. 12 § 11I ; see Redgrave v. Boston Symphony Orchestra, Inc., 399 Mass. 93, 98 (1987) (explaining the violations of rights that are prohibited by Mass. Gen. L. c. 12 § 11H and recognizing that "[s]ection 11I authorizes a private cause of action for the deprivation of secured rights").  Thus, Plaintiffs' claims properly arise under Mass. Gen. L. c. 12 § 11I.

omitted).  Coercion is not limited to "'actual or attempted physical force.'"  Currier v. Nat'l Bd. of Med. Exam'rs, 462 Mass. 1, 12-13 (2012) (quoting Buster v. George W. Moore, Inc., 438 Mass. 635, 646-47 (2003)).  In determining whether conduct constitutes threats, intimidation or coercion, the Court applies a reasonable person standard.  See Meuser v. Fed. Express Corp., 564 F.3d 507, 520 (1st Cir. 2009).

> **1.      Plaintiffs Have Made a Plausible Showing that Ozcan, BCH and Majzoub Threatened, Coerced and Intimidated Plaintiffs**

> > *a)      Ozcan's Alleged Misconduct*

Ozcan's alleged misconduct plausibly constitutes threats, intimidation and coercion. Plaintiffs have made a plausible showing that Ozcan's alleged misconduct caused Plaintiffs to fear repercussion if they did not meet Ozcan's demands for research manipulation, declined to participate in Ozcan's research misconduct, reported the research misconduct or continued in pursuit of an investigation into the alleged research misconduct.  Ozcan's allegedly frequent, explicit and violent threats, such as his claim that he would "fuck" Plaintiffs if experiments were not completed within particular windows of time, D. 33 ¶ 150, or if Cabi and Cakir did not correctly respond to his questions,  id. ¶¶ 138, 230, can objectively be viewed as the kind of "persistent and antagonistic" conduct that rises to the level of "belligerence and unprovoked hostility."  Haufler v. Zotos, 446 Mass. 489, 508 (2006).  Ozcan's statements of this kind plausibly amount to "intimidatory sexual harassment" which "is ordinarily actionable under (the MCRA)."  O'Brien v. Avis Rent a Car Sys., Inc., No. 96-cv-5501-PML, 1997 WL 260515, at *6 (Mass. Super. May 1, 1997).  Moreover, Ozcan repeatedly grabbing Cakir's phone by force and using it to send sexually inappropriate text messages, D. 33 ¶¶ 134-135, can plausibly be viewed as an intimidating and coercive display of authority.

In addition to Ozcan's alleged sexual threats, Plaintiffs allege that Ozcan repeatedly threatened Plaintiffs' job security and career trajectory in an effort to compel Plaintiffs to participate in Ozcan's alleged fabrication of data.  For instance, if Plaintiffs failed to provide the results Ozcan expected, even if that required fabricating the results, Ozcan threatened, *inter alia*, termination of employment, cancellation of publications and withholding of letters of recommendation.  Id. ¶¶ 132, 143.  Ozcan allegedly threatened to combine two manuscripts into one and submit the product to a less prestigious magazine for the explicit purpose of harming Plaintiffs' careers.  Id. ¶ 131.  Plaintiffs allege that Ozcan repeatedly threated to terminate Mert, write a bad recommendation about him and cancel publication of Mert's projects if Mert did not produce the scientific findings Ozcan demanded.  Id. ¶ 142.  Ozcan allegedly "attempt[ed] to limit [Mert's] professional advancement by controlling his professional interactions and communications with fellow scientists."  Id. ¶ 35.   Ozcan allegedly "prevented Mert's publication of research related to his doctoral dissertation."  Id. ¶ 123.  Finally, Plaintiffs allege that Ozcan inappropriately contacted Cakir's principal investigator at Vanderbilt University in May 2015.  Id. ¶ 190.

The allegedly threatening, coercive and intimidating nature of Ozcan's misconduct in this context is particularly clear in light of Ozcan's supervising position and extensive influence over the careers of Plaintiffs.  See Kennie v. Nat. Res. Dep't of Dennis, 451 Mass. 754, 763 (2008) (concluding that defendant's conduct could reasonably be viewed as coercive where defendant's statements were coupled with actions taken as part of defendant's official position); see also Rinsky, 2010 WL 5437289, at *8 (finding that decision to assign plaintiff to work with a client who behaved inappropriately towards her constituted threats, intimidation or coercion where defendant retained control over the assignment and retained authority to evaluate and direct the

plaintiff).   A reasonable person would recognize that Ozcan's alleged conduct could have "impact[ed] [Plaintiffs'] job prospects" and therefore plausibly "comprised economic coercion." Id. at *8; see Joyce v. Upper Crust, LLC, No. 10-cv-12204-DJC, 2012 WL 3028459, at *7 (D. Mass. July 25, 2012) (denying motion to dismiss Mass. Gen. L. c. 12 § 11I claim where employee alleged that verbal threats placed him in fear of reporting employer's wage violation).

### b)    BCH's Alleged Misconduct

BCH's alleged misconduct plausibly constitutes threats, intimidation and coercion.  Like Ozcan's alleged conduct, BCH's conduct must be assessed in light of the influence BCH held over Plaintiffs' careers.  See Kennie, 451 Mass. at 763.  According to Plaintiffs, BCH leveraged Plaintiffs' professional need for publishing credentials in an effort to pressure Plaintiffs to abandon their challenge to Ozcan's data.  D. 33 ¶ 120.  Specifically, after Plaintiffs reported Ozcan's alleged research misconduct, BCH sent Plaintiffs a letter conditioning Plaintiffs' authorship rights related to the SR01 manuscript on Plaintiffs' willingness to affirm the validity of data Plaintiffs knew to be fabricated.  Id. ¶¶ 106-123.  Plaintiffs were allegedly forced to choose between being associated with the false data and retaining their authorship rights on the SR01 manuscript on which they had worked.  Id.  In the end, Plaintiffs were stripped of their authorship on the SR01 manuscript.  Id. ¶¶ 114, 171.  Plaintiffs have been or will also be stripped of authorship on the SR02 manuscript.  Id. ¶ 172.  Additionally, Plaintiffs allege that after they reported Ozcan's misconduct, BCH removed Cabi and Cakir from inventorship on the SR01 and SR02 patents.  Id. ¶ 170.

Still more, Plaintiffs allege that after BCH removed Plaintiffs from Ozcan's laboratory, BCH not only failed to assign Plaintiffs to a new laboratory, as BCH had promised, but also had Cabi removed from the laboratory of another supervising scientist where Cabi had found work

for himself.   D. 33 ¶¶ 175-176, 179-185.   Given that BCH had the distinct power to affect Plaintiffs' job status, productivity and professional prospects, BCH's alleged conduct with regards to laboratory replacement plausibly constituted intimidating and coercive efforts intended to compel Plaintiffs to abandon their challenge to Ozcan's data and their reports regarding Ozcan's hostile work environment.   See Rinsky, 2010 WL 5437289, at *8 (denying motion to dismiss MCRA claim against university defendants where allegations gave rise to an inference that plaintiffs' evaluations and job prospects would suffer if she raised concerns regarding sexual harassment).

c)   <em>Majzoub's Alleged Misconduct</em>

Plaintiffs have alleged that Majzoub threatened Plaintiffs, attempted to compel certain conduct from Plaintiffs and exerted force over Plaintiffs.   For example, Plaintiffs allege that Majzoub instructed Plaintiffs to include falsified data in the SR01 manuscript.   D. 33 ¶ 93. Plaintiffs further allege that when Majzoub asked for certain fabricated data on behalf of Ozcan, Plaintiffs initially resisted, but Majzoub insisted.   Id. ¶ 95.   At this stage of the litigation, these allegations plausibly constitute threats, coercion and intimidation because they amount to an exercise of force aimed at compelling Plaintiffs to participate in the usage of falsified data and deterring Plaintiffs from reporting Ozcan's misconduct.   The alleged pressure Majzoub placed on Plaintiffs to include Ozcan's allegedly falsified data in the SR01 manuscript, id. ¶ 93, would have made a reasonable person "fearful and apprehensive."   Planned Parenthood, 417 Mass. at 476.

Plaintiffs further allege that Majzoub provided certain information to Ozcan despite the fact that Majzoub knew at the time that Ozcan intended to use the information to manufacture false scientific misconduct allegations against Cabi and Cakir and despite the fact that Plaintiffs

had informed Majzoub that they feared Ozcan's retaliation.  D. 33 ¶ 96.  Given the explicitly threatening and intimidating nature of Ozcan's alleged conduct towards Plaintiffs, it is reasonable to believe that Plaintiffs viewed Majzoub's conduct similarly intimidating once they perceived Majzoub to be working in concert with Ozcan.  Id.  Furthermore, Plaintiffs' allegations that Majzoub eliminated all of Plaintiffs' work flow in Ozcan's laboratory, id. ¶ 211, and that Majzoub refused to allow Cabi and Cakir to apply for fellowships, id. ¶ 173 can plausibly be viewed as coercive because those actions had the potential to impact Plaintiffs' careers.

### 2. Plaintiffs Have Made a Plausible Showing that the Alleged Threats, Intimidation and Coercion Interfered with Plaintiffs' Due Process and Property Rights

Defendants argue that Plaintiffs have failed to point to a specific right with which Defendants allegedly interfered.  D. 45 at 19.  The Court disagrees.  Granting Plaintiffs every reasonable inference and reading their complaint as a whole, the Court concludes that Plaintiffs have satisfied their burden.  Plaintiffs allege that BCH, Ozcan and Majzoub interfered with "the exercise or enjoyment by Dr. Cabi, Dr. Cakir and Dr. Mert of rights secured by the Constitution or law of the United States, including the First, Fifth and Fourteenth Amendments, 42 C.F.R. 93, and of comparable rights secured by the Constitution or laws of the Massachusetts."  D. 33 ¶¶ 217, 252.  At the motion hearing, Plaintiffs specifically pointed to due process and property rights related to the investigation into research misconduct, removal of Plaintiffs' names from certain patents and removal of Plaintiffs' authorship credits on certain publications.  D. 73 at 20.  Plaintiffs further asserted that all of these retaliatory actions occurred despite BCH and Majzoub's assurances that they would not retaliate against Plaintiffs for reporting Ozcan's misconduct and despite BCH's generally applicable non-retaliation policy.  Id.  Plaintiffs allege

that they all had authorship rights on the SR01 and SR02 manuscripts, D. 33 ¶¶ 61, 82-90, 99-111, 171, and that Cabi and Cakir held inventorship rights as to the SR01 and SR02 patents. Id. ¶ 59-61, 67, 72.

Courts have recognized both property rights and the right to be free from retaliation as sufficient to satisfy this element of a MCRA claim. See e.g., LaFountaine v. BJ's Wholesale Club, Inc., No. 08-cv-0487-TQF, 2008 WL 4926675, at *5 (Mass. Super. Oct. 27, 2008) (dismissing MCRA claim on unrelated grounds but concluding that plaintiff sufficiently pleaded "his rights, secured by the [the Americans with Disabilities Act] and G. L. c. 151B, to be free from discrimination and retaliation"); Joanne Vania v. Reginald Hartley, Jr., No. 94-cv-373-REW, 1997 WL 282319, at *2 (Mass. Super. May 27, 1997) (explaining that actual interference with or attempted interference with property rights without due process of law is actionable under the MCRA). Thus, Plaintiffs' showing that BCH, Ozcan and Majzoub's threats, intimidation and coercion interfered with Plaintiffs' due process and property rights is at least sufficient to survive this motion to dismiss. Accordingly, Ozcan, BCH and Majzoub's request to dismiss Plaintiffs' MCRA claim is denied.

The motion to dismiss as brought by Fenwick and Garvin, however, is allowed because Plaintiffs have presented no allegations that Fenwick and Garvin threatened, intimidated or coerced them. The only allegations in the complaint that specifically address Fenwick are that she is the President and Chief Executive Officer of BCH and that she has decision-making responsibility for BCH. D. 33 ¶¶ 12, 242, 248, 254. The only allegations in the complaint that specifically address Garvin are that she is the Senior Vice President and General Counsel of BCH and that she has decision-making responsibility for BCH. Id. ¶¶ 13, 242, 248, 254. Moreover, Plaintiffs make no attempt in their opposition to defend this claim specifically as it is

brought against Fenwick and Garvin.   D. 46 at 8-9.   In the absence of any allegations that Fenwick and Garvin threatened, intimidated or coerced Plaintiffs, Fenwick and Garvin are entitled to dismissal.   See e.g., Santiago v. Keyes, 890 F. Supp. 2d 149, 156 (D. Mass. 2012) (granting motion to dismiss MCRA claim against an individual defendant because "[t]he pleadings . . . d[id] not allege with specificity . . . that [the defendant] engaged in any conduct that could be deemed a 'threat, intimidation, or coercion' for purposes of the MCRA"); Stone v. Caswell, 963 F. Supp. 2d 32, 38 (D. Mass. 2013) (granting motion to dismiss MCRA claim where plaintiff failed to plead  "deprivations by way of threats, coercion or intimidation").

## C.   Plaintiffs Have Adequately Stated a Hostile Work Environment in Violation of Title VII against BCH (Count IV)

Plaintiffs assert a hostile work environment claim against BCH.   D. 33 ¶¶ 257-261. Pursuant to Title VII of the Civil Rights Act of 1964, it is unlawful for a "workplace [to be] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."   Torres-Negrón v. Merck & Co., Inc., 488 F.3d 34, 39 (1st Cir. 2007) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).  In assessing whether an employment claim survives a motion to dismiss, the pivotal question is not "'whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'"   Gorski v. New Hampshire Dep't of Corr., 290 F.3d 466, 473 (1st Cir. 2002)

A hostile work environment claim under Title VII requires plaintiff to show (1) membership in a protected class (2) that s/he was subjected to unwelcome sexual or racial harassment (3) that the harassment was based upon sex or race (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment (5) that the conduct at issue was both objectively and subjectively

offensive and (6) a basis for employer liability.  Douglas v. J.C. Penney Co., 474 F.3d 10, 15 (1st

Cir. 2007).

"Title VII does not prohibit all verbal or physical harassment in the workplace" and is

not a "general civility code."   Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80-81

(1998).  Instead, Title VII is aimed at "prohibit[ing] employment discrimination on the basis of

race, color, religion, sex, or national origin."  Ricci v. DeStefano, 557 U.S. 557, 577 (2009); see

Franceschi v. U.S. Dep't of Veterans Affairs, 514 F.3d 81, 85 (1st Cir. 2008) (describing Title

VII as "a vehicle through which an individual may seek recovery for employment discrimination

on the grounds of race, color, religion, gender, or national origin").   "Title VII has been

construed expansively to protect against the creation of a work environment 'heavily charged'

with racial or national origin discrimination."   Saliceti-Valdespino v. Wyndham Vacation

Ownership, No. 12-cv-1325-GAG, 2013 WL 5947140, at *5 (D.P.R. Nov. 6, 2013).

Importantly, the harassment must be motivated by the plaintiff's membership in a protected class

to be cognizable under Title VII.  See Burns v. Potter, 334 F. Supp. 2d 13, 19-20 (D. Mass.

2004) (citing Oncale, 523 U.S. at 80).

### 1.        Plaintiffs Have Plausibly Pleaded Membership in a Protected Class

Although it is not perfectly pleaded, Plaintiffs have alleged that they are Turkish.  D. 33

¶¶ 141, 139, 258.  Indeed, BCH recognized in its  memorandum that Plaintiffs are Turkish

nationals.  D. 45 at 10, 21; D. 73 at 9.  Plaintiffs' alleged status as Turkish nationals places them

within the protected classes of national origin, ethnicity and race.  See e.g., Kosereis v. Rhode

Island, 331 F.3d 207, 212 (1st Cir. 2003) (treating plaintiff's Turkish identity as membership in a

protected class); Hajian-Bahmany v. Women & Infants Hosp. of Rhode Island, No. 10-cv-120-

JJM, 2011 WL 3424642, at *3 (D.R.I. Aug. 4, 2011) (stating that "[plaintiff], a Middle Eastern

woman, is clearly part of a protected class").  BCH acknowledges that protected classes under

Title VII include "race, color [and] . . . national origin."  D. 45 at 21 n.7.

### 2. Plaintiffs Have Plausibly Pleaded that They Were Subjected to Severe and Persistent Racial and Sexual Harassment

Plaintiffs allege that Ozcan knew that Plaintiffs' mothers were Turkish.  D. 33 ¶ 141.

Ozcan, nonetheless, allegedly made derogatory comments that related to each of the Plaintiffs'

Turkish identities, the Turkish identities of their parents and Plaintiffs' ethnic and racial

background more generally.  D. 33 ¶¶ 124, 141, 258.  The Court has already detailed those

allegations.  According to Plaintiffs, in addition to generally making sexually explicit comments

in the workplace, Ozcan also lobbied sexual threats at Plaintiffs.  Id. ¶¶ 33, 129, 130, 133, 138,

150, 153.  Ozcan routinely made comments regarding Cabi's sex life and Ozcan's own sex life.

Id. ¶¶ 129-130, 150.  Ozcan forcibly used Cakir's cell phone to send sexually explicit text

messages pretending to be Cakir.  Id. ¶¶ 134-135.

In deciding a hostile work environment claim, "a court must mull the totality of the

circumstances, including factors such as the frequency of the discriminatory conduct; its

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

whether it unreasonably interferes with an employee's work performance."  Noviello v. City of

Boston, 398 F.3d 76, 92 (1st Cir. 2005) (internal citations and quotation marks omitted)).  Here,

the repetitive, explicit and vulgar nature of Ozcan's comments must be considered.  Id.  The

allegedly "frequent[]" and "regular[]" nature of Ozcan's sex-based, ethnicity-based, race-based

and national origin-based comments, D. 33 ¶¶ 139, 146-147, supports a finding that the

harassment was pervasive.  See e.g., Colondres v. Potter, No. 11-cv-1171-JAF, 2012 WL

1069257, at *2 (D.P.R. Mar. 29, 2012) (finding that defendant's "frequent[]" engagement in

sexually inappropriate comments and conduct supported a hostile work environment claim

sufficient to survive motion to dismiss); <u>Cannell v. Corizon, LLC</u>, No. 14-cv-405-NT, 2015 WL 8664209, at *6 (D. Me. Dec. 11, 2015) (denying motion to dismiss racially motivated hostile work environment where plaintiff alleged that offensive comments occurred regularly).   In addition, Ozcan's comments specifically and negatively referenced Plaintiffs' ethnicityand national origin – a point that supports the conclusion that Ozcan's harassment was severe.   Taken together, Ozcan's alleged ethnicity-based, national origin-based and sex-based harassment was "sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment."  See <u>Douglas</u>, 474 F.3d at 15.  The Court concludes that Ozcan's conduct, as alleged, was "both objectively and subjectively offensive."[3]  <u>Id.</u>  Ozcan's harassment far surpassed "the ordinary, if occasionally unpleasant, vicissitudes of the workplace" and, instead, constituted "actual harassment."  <u>Noviello</u>, 398 F.3d at 92.  Moreover, the explicit nature of Ozcan's alleged derogatory comments undercuts BCH's argument that Plaintiffs have not sufficiently established that Ozcan treated Plaintiffs unfairly due to their membership in a protected class.  D. 45 at 20.

Finally, BCH does not argue that a basis for employer liability is lacking.  For the sake of completeness, the Court nonetheless concludes that the basis for employer liability is apparent. Ozcan was allegedly Plaintiffs' supervisor, the alleged misconduct occurred at work and BCH allegedly knew about Ozcan's behavior due to prior complaints.  D. 33 ¶ 126.  "An employer is

---

[3] The Court agrees with Plaintiffs that the possibility that Plaintiffs share a gender or ethnicity with Ozcan does not bar this claim.  D. 46 at 10-11 (citing, *inter alia*, <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 78 (1998)).  In <u>Oncale</u>, the Supreme Court held that a hostile work environment claim could be based on the actions of a person who happens to be a member of the same protected class as the plaintiff.   <u>Oncale</u>, 523 U.S. at 79.  The Supreme Court made clear that "in the . . . context of racial discrimination in the workplace we have rejected any conclusive presumption that an employer will not discriminate against members of his own race."  <u>Id.</u> at 78.  As such, any suggestion that Ozcan's Turkish identity should contribute to a conclusion that Plaintiffs have failed to allege a hostile work environment, D. 45 at 22, is contrary to established law.

subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998).  For these reasons, BCH's motion to dismiss Plaintiffs' Title VII claim is denied.

### D.     Plaintiffs Have Adequately Pleaded a Hostile Work Environment in Violation of Mass. Gen. L. c. 151B against BCH and Ozcan (Count V)

Plaintiffs assert a Mass. Gen. L. c. 151B claim against BCH and Ozcan.  D. 33 ¶¶ 262-269. The standard for pleading a hostile work environment claim under Mass. Gen. L. c. 151B is identical to the standard for a parallel claim under Title VII.  See Navarro v. U.S. Tsubaki, Inc., 577 F. Supp. 2d 487, 509 (D. Mass. 2008).  Thus, for the same reasons discussed in relation to Plaintiffs' hostile work environment claim under Title VII, the Court concludes that Plaintiffs have raised a plausible claim under Mass. Gen. L. c. 151B.  Accordingly, the Court denies BCH and Ozcan's motion to dismiss this claim.

### E.     Plaintiffs' Retaliation Claims (Count VI)

Plaintiffs allege retaliation against BCH, Ozcan and Majzoub under seven distinct statutes and regulations.  D. 33 ¶¶ 272-276.  Specifically, Plaintiffs allege retaliation in violation of 42 U.S.C. § 289(b)(e), 42 U.S.C. § 1981, Mass. Gen. L. c. 149 § 185, 42 U.S.C. § 2000e-3(a), Mass. Gen. L. c. 151B, 42 C.F.R. § 93 and 42 U.S.C. § 1983.

### 1.     Defendants Are Entitled to Dismissal of Plaintiffs' Claims under 42 U.S.C. § 289(b)(e) and 42 C.F.R. § 93

42 U.S.C. § 289 is a federal regulation concerning institutional review boards; pursuant to the regulation, the Secretary of Health and Human Services must engage in certain regulatory functions in connection with funds for biomedical or behavioral research.  See 42 U.S.C. § 289; see also Missert v. Trustees of Boston Univ., 73 F. Supp. 2d 68, 70 (D. Mass. 1999) aff'd, 248

F.3d 1127 (1st Cir. 2000) (describing 42 U.S.C. § 289 as "federal law requir[ing] [the university-defendant] to establish an [independent review board] to review and approve research carried out by its faculty members involving human subjects").  Importantly, 42 U.S.C. § 289 "does not provide a private right of action nor does it evidence an intent to do so."  Tilousi v. Arizona State Univ., No. 04-cv-1290-FJM, 2005 WL 6199562, at *2 (D. Ariz. Mar. 3, 2005) (rejecting plaintiffs' attempt to assert a claim under 42 U.S.C. § 289).  Accordingly, Plaintiffs' claims under this regulation are dismissed.

Similarly, 42 C.F.R. § 93 is a regulation mandating that institutions conduct inquiries "to determine whether an investigation is necessary" when research misconduct is alleged.  Anversa v. Partners Healthcare Sys., Inc., No. 14-cv-14424-DJC, 2015 WL 4554190, at *3 (D. Mass. July 28, 2015) (describing the purpose of 42 C.F.R. § 93 while resolving plaintiffs' breach of contract, breach of implied covenant of good faith and fair dealing, tortious interference, unfair trade practices and privacy claims).  Plaintiffs concede that 42 C.F.R. § 93 does not create a cause of action.  D. 33 ¶¶ 247, 272.  Thus, the Court dismisses Plaintiffs' claim.

### 2. Plaintiffs Have Adequately Stated a Retaliation Claim under Title VII against BCH

To establish a retaliation claim under Title VII, codified at 42 U.S.C. section 2000e-3(a), a plaintiff must show that (1) he engaged in protected conduct under Title VII (2) he was subjected to an adverse employment action and (3) the adverse employment action was casually connected to the protected activity.  See Hernandez-Torres v. Intercontinental Trading, Inc., 158 F.3d 43, 47 (1st Cir. 1998).  Plaintiff must also show that "but for" his reporting of the misconduct, he would not have suffered the adverse employment action.  See Univ. of Texas Sw. Med. Ctr. v. Nassar, __U.S. __, 133 S. Ct. 2517, 2534 (2013).

Plaintiffs' allegations satisfy the requirements of this claim.  First, Plaintiffs adequately allege that they reported the hostile work environment that was created by Ozcan.  D. 33 ¶¶ 33-35, 124-57.  A hostile work environment constitutes an employment practice prohibited by Title VII.  See Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986).  Because Plaintiffs reported Ozcan's alleged misconduct to BCH directly, the requirement of retaliator knowledge of the protected activity is satisfied.  See Medina-Rivera v. MVM, Inc., 713 F.3d 132, 139 (1st Cir. 2013) (noting that "the employee must show that the retaliator knew about her protected activity" because "one cannot have been motivated to retaliate by something he was unaware of").

Second, Plaintiffs allege that BCH took adverse employment action against Plaintiffs, including removing Plaintiffs from Ozcan's laboratory without placing them in an alternative laboratory, removing Cabi and Cakir from SR01 and SR02 patent inventorship, removing Cabi, Cakir and Mert from authorship on the SR01 and SR02 manuscript and terminating Plaintiffs' employment.  Id. ¶¶ 17, 54, 81-90, 188, 193, 278.  "[A] reasonable employee would have found [BCH's actions against Plaintiffs] materially adverse" because removal from the laboratory, loss of property rights and employment termination "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (internal quotation marks omitted).  "Indeed, the paradigmatic act of retaliation is firing an employee for complaining to a superior about conduct that constitutes . . . discrimination."  Rodriguez-Vives v. Puerto Rico Firefighters Corps of Puerto Rico, 743 F.3d 278, 284 (1st Cir. 2014).

Plaintiffs' allegations give rise to a plausible inference that the protected activity caused the retaliation.  Where "adverse action is taken against a satisfactorily performing employee in the immediate aftermath of the employer's becoming aware of the employee's protected activity,

an inference of causation is permissible." <u>Mole v. Univ. of Massachusetts</u>, 442 Mass. 582, 592 (2004).   In other words, "'[c]lose temporal proximity between two events may give rise to an inference of causal connection.'" <u>Nethersole v. Bulger</u>, 287 F.3d 15, 20 (1st Cir. 2002) (quoting <u>Hodgens v. Gen. Dynamics Corp.</u>, 144 F.3d 151, 168 (1st Cir. 1998)).   In the absence of direct evidence of a causal connection, "[t]he proximity in time between the protected activity and the alleged retaliation is circumstantial evidence of motive." <u>Bajana v. Potter</u>, 396 F. Supp. 2d 78, 88 (D.P.R. 2005).   Temporal proximity is particularly suggestive where the alleged retaliatory action is severe.   <u>Noviello</u>, 398 F.3d at 86 (noting that "[w]hen harassment follows hard on the heels of protected activity, the timing often is strongly suggestive of retaliation").   Therefore, "[i]n reviewing a Rule 12(b)(6) dismissal, [the Court] may neither ignore the allegation of temporal proximity, nor presume that it is a mere coincidence." <u>Nethersole</u>, 287 F.3d 15, 20.

Based on the allegations, prior to reporting Ozcan's misconduct, Cabi, Cakir and Mert received favorable treatment and reviews.   For example, in June 2012, Ozcan publically described Cabi and Cakir as "really great scientists." D. 33 ¶ 23.   In July 2013, Ozcan raised Cabi's and Cakir's salaries.   <u>Id.</u> ¶ 27.   In November 2013, Ozcan praised Cabi as "the smartest scientist that I have met in life." <u>Id.</u> ¶ 28.   In February 2014, Ozcan assigned Cakir to a leadership position and promoted Mert.   <u>Id.</u> ¶ 26.   In February 2014, Ozcan recommended that Cabi and Cakir apply for fellowships; in March 2014, Majzoub offered to support their applications for fellowships.   <u>Id.</u> ¶ 173.   These allegations plausibly suggest that Plaintiffs were satisfactorily performing employees.   On March 3, 2014, Plaintiffs made initial reports to BCH management regarding Ozcan's alleged misconduct.   <u>Id.</u> ¶¶ 33-35.   According to Plaintiffs, that same month Plaintiffs began experiencing the wave of adverse employment action that the Court has previously summarized.   <u>Id.</u> ¶¶ 166-193.   Plaintiffs allege that the adverse action continued

for months and ultimately led to their termination.  Id. ¶¶ 166-193, 278.  Under these particular

facts, the allegedly stark contrast in the treatment Plaintiffs received in the immediate aftermath

of reporting Ozcan's misconduct creates a plausible inference that Plaintiffs' report was the "but

for" cause of the adverse employment actions.  See e.g., Polo-Echevarria v. Centro Medico del

Turabo, Inc., 949 F. Supp. 2d 332, 340 (D.P.R. 2013) (denying motion to dismiss where plaintiff

was allegedly terminated from employment "shortly after" reporting a hostile work

environment); Nethersole, 287 F.3d at 20 (denying motion to dismiss where defendant

announced that it was considering terminating plaintiff's employment "within a matter of weeks"

of plaintiff requesting a meeting with management to discuss diversity policies).

        In light of this analysis, the Court is unpersuaded by Defendants' argument that

Plaintiffs have not sufficiently pleaded that Plaintiffs' engagement in protected activity was the

cause of the adverse employment actions.  D.39 at 12; D. 45 at 25-26.  Defendants' argument

fails to take into account the weight courts may assign to temporal proximity between the

protected activity and the adverse employment action at the motion to dismiss stage.  Viewing

the allegations as a whole and in the light most favorable to Plaintiffs, the Court concludes that

Plaintiffs have stated a plausible claim of retaliation under Title VII against BCH.  This claim as

against Majzoub and Ozcan, however, fails and is dismissed because "there is no individual

employee liability under Title VII."  Fantini v. Salem State Coll., 557 F.3d 22, 30 (1st Cir. 2009).

###### 3.     Plaintiffs Have Adequately Stated a Retaliation Claim under 42 U.S.C. § 1981 against BCH, Ozcan and Majzoub

42 U.S.C. § 1981 "prohibits not only racial discrimination but also retaliation against those who oppose it."  Univ. of Texas, 133 S. Ct. at 2529 (citing CBOCS W., Inc. v. Humphries, 553 U.S. 442, 445 (2008)).  A retaliation claim pursuant to section 1981 requires that a plaintiff show that (1) he engaged in statutorily protected activity (2) he suffered an adverse employment action and (3) the protected conduct and adverse employment action were casually connected. See Pina v. Children's Place, 740 F.3d 785, 801 (1st Cir. 2014).

Plaintiffs pleaded that they engaged in the statutorily protected conduct of opposing and reporting racial discrimination.  D. 33 ¶¶ 34-35.  Plaintiffs offer a series of alleged comments Ozcan made that explicitly referenced race and did so in a derogatory manner. Id. ¶¶ 127, 139, 141, 144, 146.  Given the alleged nature and frequency of these comments, it is plausible that Ozcan's race-based comments created a work environment that unfairly targeted and treated Turkish, African American and Mexican individuals; that such treatment in the workplace rose to the level of discrimination; and/or that such discriminatory intent motivated Ozcan's conduct towards Plaintiffs.  It is further plausible that, as Plaintiffs have specifically alleged, Plaintiffs opposed this alleged racial discrimination against not only themselves but also African Americans and Mexicans by reporting Ozcan's race-based comments and conduct.  D. 33 ¶ 1, 124, 275.  In short, Defendants' chief challenge to this claim – that Plaintiffs have not sufficiently alleged that the discrimination they opposed was race-based – is unpersuasive in light of the nature of Ozcan's alleged statements and threats.  D. 45 at 27.

Turning to the other elements of the claim, Plaintiffs sufficiently allege that they suffered adverse employment actions including termination.  Id. ¶ 278.  For all of the same reasons that the Court found that the "but for" requirement under Title VII was satisfied, the Court finds that

the casual connection between the alleged protected activity and the alleged adverse employment action at issue in a section 1981 action is satisfied.  As such, Plaintiffs have satisfied all of the elements of a retaliation claim under 42 U.S.C. § 1981.

Without providing a single citation, Ozcan argues that Plaintiffs cannot raise a claim pursuant to section 1981 because Ozcan is not a state actor.  D. 32 at 10-11.  This argument is meritless because state action is not required for section 1981.  Ahanotu v. Massachusetts Tpk. Auth., 466 F. Supp. 2d 378, 397 (D. Mass. 2006) (stating that "[n]o state action is required to enforce rights under § 1981"); Briddell v. Saint-Gobain Abrasives, Inc., No. 04-cv-40146-FDS, 2007 WL 1101158, at *9 (D. Mass. Mar. 30, 2007) (permitting section 1981 discrimination claim brought against corporate employer to proceed to trial).  The retaliation claim against BCH, Ozcan and Majzoub survives the motions to dismiss.

### 4.    Plaintiffs Have Adequately Stated a Claim of Retaliation under Mass. Gen. L. c. 151B against BCH, Ozcan and Majzoub

A claim of unfair retaliation under Mass. Gen. L. c. 151B requires a showing that plaintiff (1) engaged in protected conduct (2) suffered an adverse action and (3) that a causal connection existed between the protected conduct and the adverse action.  See Araujo v. UGL Unicco-Unicco Operations, 53 F. Supp. 3d 371, 382 (D. Mass. 2014).  Given the overlapping legal standards, for the same reasons that the Court concluded that Plaintiffs have adequately stated retaliation claims under Title VII and 42 U.S.C. § 1981, the Court concludes that Plaintiffs' retaliation claim under Mass. Gen. L. c. 151B survives Defendants' motions to dismiss.  See Ritchie v. Dep't of State Police, 60 Mass. App. Ct. 655, 665-666 (2004) (declining to dismiss Mass. Gen. L. c. 151B retaliation claim where protected activity and adverse action were alleged and temporal proximity between protected activity and adverse action created a sufficient inference of casual connection) (internal citation omitted).

29

Case 1:15-cv-12306-DJC   Document 76   Filed 02/12/16   Page 30 of 44

**5.** **Defendants Are Entitled to Dismissal of Plaintiffs' Retaliation Claim under 42 U.S.C. § 1983**

In addition to the standard requirements for a retaliation claim, a retaliation claim under section 1983, codified at U.S.C. § 2000e-3(a), requires a showing of state action.  See <u>Ramos-Biaggi v. Martinez</u>, 98 F. Supp. 2d 171, 177-78 (D.P.R. 2000).  For all of the reasons already discussed, Plaintiffs have failed to make any showing of state action.  As such, Plaintiffs' retaliation claim under 42 U.S.C. § 1983 is dismissed.

**6.** **Defendants Are Entitled to Dismissal of Plaintiffs' Retaliation Claim under Mass. Gen. L. c. 149 § 185**

Plaintiffs have failed to state a retaliation claim under Mass. Gen. L. c. 149 § 185 because Defendants do not qualify as employers under the statute.  Mass. Gen. L. c. 149 § 185 creates a cause of action for public employees who are retaliated against for disclosing an unlawful activity, policy or practice of a state government employer.  The statute defines an employer as:

> [T]he commonwealth, and its agencies or political subdivisions, including, but not limited to, cities, towns, counties and regional school districts, or any authority, commission, board or instrumentality thereof.

Mass. Gen. L. c. 149 § 185(a)(2).  Based on the plain language of the statute, none of the Defendants qualify as an "employer" under the controlling definition.  Plaintiffs suggest that BCH qualifies as an employer under this statute because BCH has a "quasi-public status triggering application of this statute."  D. 33 ¶ 274.  Even assuming arguendo that BCH has a quasi-public status, that status still falls short of the strictly construed definition of an employer for the purposes of  Mass. Gen. L. c. 149 § 185.  A "quasi-public" entity is not "the commonwealth,

not an " agenc[y]" of the commonwealth and not a "political subdivision[]" of the commonwealth.  See e.g., <u>Ahanotu</u>, 466 F. Supp. 2d at 395-396 (dismissing Mass. Gen. L. c. 149

§ 185 claim where defendant was not an "instrumentality of the state based on a plain reading of the statute"); <u>Boisvert v. Genzyme Corp.</u>, No. 2011-cv-00131-RJC, 2011 WL 5841680, at *2 (Mass. Super. Oct. 5, 2011) (dismissing Mass. Gen. L. c. 149 § 185 claim because defendant "d[id] not fit the statutory definition of an 'employer,' as it [was] neither an agency nor a political subdivision of the Commonwealth").  Thus, dismissal is warranted.

### F.     Plaintiffs Have Adequately Stated a Conspiracy Claim under 42 U.S.C. § 1985 against BCH, Ozcan and Majzoub (Count VII)

Plaintiffs allege civil conspiracy in violation of 42 U.S.C. § 1985[4] against BCH, Ozcan, Majzoub, Fenwick and Garvin.[5]  D. 33 ¶¶ 282-297.  Section 1985 provides a remedy for acts of civil conspiracy.  To plead this claim adequately, Plaintiffs must demonstrate four elements.  <u>See</u> <u>Perez-Sanchez v. Pub. Bldg. Auth.</u>, 531 F.3d 104, 107 (1st Cir. 2008).  First, Plaintiffs "must allege a conspiracy."  <u>Id.</u> (citing <u>Aulson v. Blanchard</u>, 83 F.3d 1, 3 (1st Cir. 1996)).  Second, Plaintiffs must allege that the purpose of the conspiracy is to "deprive the plaintiff[s] of the equal protection of the laws."  <u>Perez-Sanchez</u>, 531 F.3d at 107.  Third, Plaintiffs must "identify an overt act in furtherance of the conspiracy."  <u>Id.</u>  Finally, Plaintiffs must show "either injury to person or property, or a deprivation of a constitutionally protected right."  <u>Id.</u>

Plaintiffs have adequately alleged a conspiracy, an overt act in furtherance of the conspiracy and injury.  Plaintiffs allege that the anti-obesity medication on which they

---

[4] To the extent Plaintiffs intended to raise a common law civil conspiracy claim in their opposition, that attempt fails because the complaint makes no mention of a common law civil conspiracy claim and Plaintiffs are limited to the claims that are raised in the complaint.  <u>See</u> <u>Portfolioscope, Inc. v. I-Flex Sols. Ltd.</u>, 473 F. Supp. 2d 252, 256 (D. Mass. 2007) (noting that "a [p]laintiff may not amend its pleadings in the opposition memorandum"); <u>see also</u> <u>In re Tyco Intern., Ltd. Multidistrict Litig.</u>, No. 02-cv-1335-PJB, 2004 WL 532193, at *1 (D. N. H. Mar. 16, 2004) (holding that the court "cannot take into account" claims, facts or allegations "found outside of complaint").

[5] Plaintiffs have conceded that ERX did not participate in the alleged conspiracy.  D. 33 ¶ 284.  Thus, this claim is not asserted against ERX.

collaborated with Ozcan "stands to generate a tremendous amount of revenue for ERX, Dr. Ozcan, Dr. Majzoub and BCH." D. 33 ¶ 290. Plaintiffs allege that their attempt to report Ozcan's research misconduct threatened the revenue stream related to the anti-obesity medication. Id. Plaintiffs allege that Ozcan, BCH and Majzoub conspired to deprive Plaintiffs of their rights, immunities and property by cutting Plaintiffs out of that revenue stream. Id. ¶¶ 288, 290-91. As to an overt act in furtherance of the conspiracy and a resulting injury, Plaintiffs allege that Ozcan, BCH and Majzoub have in fact removed Cabi and Cakir from the SR01 and SR02 patents; Ozcan, BCH and Majzoub have removed Plaintiffs from the SR01 manuscript; and Ozcan, BCH and Majzoub leveraged Plaintiffs' need to publish in an effort to "quash" Plaintiffs' challenge to the validity of Ozcan's data. Id. ¶¶ 170-172, 288. Plaintiffs further allege that they suffered damages as a result of the conspiracy. Id. ¶ 296.

Plaintiffs have also plausibly pleaded that BCH, Ozcan and Majzoub conspired against them because of their membership in a protected class. On this element of the claim, Plaintiffs must prove that there exists a "racial, or perhaps otherwise class-based invidiously discriminatory animus behind the conspirator's action." Griffin v. Breckenridge, 403 U.S. 88, 102 (1971). Plaintiffs must demonstrate that BCH, Ozcan and Majzoub "conspired against [them] *because* [of their membership in a protected class]." Diva's Inc. v. City of Bangor, 411 F.3d 30, 39 (1st Cir. 2005) (emphasis in original). In arguing that Plaintiffs have failed to satisfy this element of the claim, Defendants fail to read the complaint as a whole. D. 39 at 13; D. 45 at 29.

As discussed, Plaintiffs have alleged that they are Turkish. D. 33 ¶ 141. Plaintiffs have also alleged the hostile work environment created by Ozcan and the manner in which Ozcan's comments and treatment targeted Plaintiffs based on their Turkish identities. Id. ¶¶ 124-157.

Those same allegations give rise to a plausible inference that Ozcan's attempts to cut Plaintiffs out of the revenue stream of the anti-obesity medication were motivated by racial animus.  D. 33 ¶ 217 (alleging that "[s]elective treatment of the Fellows was motivated by an intention to inhibit their exercise or enjoyment of constitutional and statutory rights").  Plaintiffs' allegation that BCH received earlier reports of Ozcan's race-based comments and failed to take action, id. ¶ 126, suffices at this point in the litigation to create a plausible inference that BCH was complicit in Ozcan's animus.  Similarly, the allegations that Majzoub assisted Ozcan in generating false research misconduct reports against Plaintiffs, id. ¶ 287, suffices at this point in the litigation to create a plausible inference that Majzoub was complicit in Ozcan's animus.  For these reasons, assuming the truth of the allegations, as the Court must at this stage, the motions to dismiss the conspiracy claim as to BCH, Majzoub and Ozcan are denied.  Because Plaintiffs present no allegations specifically addressing Fenwick or Garvin, pointing to any specific role they had in the conspiracy or pointing to any overt act Fenwick or Garvin took in furtherance of the conspiracy, the claim as brought against Fenwick and Garvin is dismissed.

### G.     Plaintiffs Have Adequately Stated a Breach of Contract Claim against BCH (Count VIII)

Plaintiffs assert a breach of contract claim against BCH.  D. 33 ¶¶ 289-306.  Under Massachusetts law, a plaintiff alleging a breach of contract claim must show (1) that the parties entered into a valid contract (2) the plaintiff performed or was ready to perform his obligations under the contract (3) the defendant breached the contract and (4) the plaintiff sustained damages as a result of the breach.  See Linton v. New York Life Ins. & Annuity Corp., 392 F. Supp. 2d 39, 41 (D. Mass. 2005).  BCH rests its request to dismiss this claim primarily on its contention that Plaintiffs do not plausibly allege that a contract existed between BCH and Plaintiffs.  D. 45 at 30.  In response, Plaintiffs point to three alleged agreements:  (1) BCH's general employment

policies, including its research misconduct policy, (2) BCH's alleged promise to find Plaintiffs new laboratories at which to work and (3) BCH's alleged promise to pay Cabi and Mert's salaries and expenses through a specified date.  D. 33 ¶¶ 299-304; D. 46 at 17.

### 1. As Pleaded, BCH's Employment Policies Do Not Amount to an Enforceable Contract

BCH argues that, as a matter of law, employer's policies can constitute an enforceable contract only under very limited circumstances and none of those circumstances is present here. D. 45 at 30.  According to BCH, Plaintiffs have failed to offer allegations suggesting that the parties intended for the employment policy to rise to the level of an enforceable contract.  Id. at 30-31.  Without offering any elaboration, Plaintiffs respond to BCH's challenge by simply insisting that Plaintiffs may rely on agreements concerning the terms and conditions of their employment, including the research misconduct policy that included non-retaliation for whistleblowers.  D. 33 ¶ 299; D. 46 at 17.

Based on the allegations in the operative complaint, the Court concludes that BCH's argument prevails.  "Personnel handbooks do not have uniform legal significance."  Campbell v. Gen. Dynamics Gov't Sys. Corp., 407 F.3d 546, 558-59 (1st Cir. 2005).  "[T]he enforceability of an employee handbook as a contract depends upon a host of considerations, including its content and the circumstances of its distribution."  Id.  Employer policies or handbooks only give rise to an enforceable contract where there are specific allegations demonstrating that the terms of the policies or the conduct of the parties towards the policies reflect traditional contract formation. See Jackson v. Action for Boston Cmty. Dev., Inc., 403 Mass. 8, 14 (1988) (assessing "all the circumstances" and the "relation of the parties" to determine whether an "implied contract based on the personnel manual's terms existed"); see also Weber v. Cmty. Teamwork, Inc., 434 Mass. 761, 780 (2001) (explaining that "[w]here an employee signs a personnel policy, negotiates

specific terms as a condition of beginning or continuing employment, or where an employer calls special attention to the policy, a finding that the terms of the policy form the basis of an implied contract may be justified").

Plaintiffs fail to offer any allegations regarding the nature, substance or formation of the employment policies – the factors that Massachusetts courts have identified as crucial to elevating a general employment policy to an enforceable contract. See Jackson, 403 Mass. 8, 14-15 (determining that employment manual did not amount to an enforceable contract). Plaintiffs' allegations do not remotely address whether BCH retained unilateral authority to modify the policies' terms, whether Plaintiffs and BCH engaged in any negotiations regarding the policies, whether the policies state any term of employment or whether Plaintiffs signed the policies or otherwise assented to the terms. Indeed, Plaintiffs have not even provided a complete copy of the employment policies upon which Plaintiffs attempt to base this breach of contract claim. In the complete absence of these legally crucial allegations, "the conclusion is inexorable that no implied contract based on the personnel manual's terms existed." Id. at 4; see also Pearson v. John Hancock Mut. Life Ins. Co., 979 F.2d 254, 259 (1st Cir. 1992) (concluding that plaintiff failed to allege sufficient facts regarding contract formation to support his contention that the employment manual amounted to a contract).

> **2.      BCH's Promise to Pay Cabi and Mert's Salaries and Expenses Plausibly Constitutes a Contract, While BCH's "[H]ope[]" that It Would Be Able to Place Plaintiffs in a New Laboratory Does Not**

BCH's promise to place Plaintiffs in new laboratories and BCH's promise to support Cabi and Mert's[6] salaries and miscellaneous expenses until a certain date are memorialized in the

_____

[6] The breach of contract claim regarding BCH's alleged promise to pay salaries and expenses is not raised on behalf of Cakir. D. 33 ¶¶ 301, 302. Plaintiffs explain in their opposition that BCH

same set of June 19, 2014 letters.[7]  D. 33-1 at 57, 61.  In the letters, BCH writes, "Children's will support your salary and miscellaneous expenses for a one year period and we are hopeful that we will shortly identify a lab which the PI and you agree will be a good environment for you."  Id. In the letters, BCH makes several requests of Plaintiffs, including but not limited to asking Plaintiffs to refrain from discussing "these issues with anyone outside of the Ozcan lab."  Id. at 57-58, 61-62.

Plausibly, BCH's assertion that it "will" pay Cabi and Mert's salaries and expenses amounted to an enforceable contraction.  "[T]o create an enforceable contract, there must be agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement."  Lambert v. Fleet Nat. Bank, 449 Mass. 119, 123 (2007) (quoting Situation Mgmt. Sys., Inc. v. Malouf, Inc., 430 Mass. 875, 878 (2000)).  In the letters, BCH promised to pay Cabi and Mert's salaries and expenses in exchange for the benefit of, inter alia, Plaintiffs' discretion.  D. 33-1 at 57, 61.  Thus, the agreement regarding Cabi and Mert's salary and expenses contains "a bargained-for exchange in which there is a legal detriment of the promisee or a corresponding benefit to the promisor."  Neuhoff v. Marvin Lumber & Cedar Co., 370 F.3d 197, 201 (1st Cir. 2004) (internal quotation marks and citations omitted).  In this way, BCH's promise to pay salaries and expenses plausibly amounted to an enforceable obligation.  According to BCH, Plaintiffs' suggestion that BCH was obligated to "employ" Cabi and Mert is baseless because the letters at issue contain no language addressing employment and instead specifically and exclusively refer to salaries.  D. 45 at 32.  The Court

---

initially promised to cover Cakir's salary but in the interim Cakir found a new job elsewhere.  D. 46 at 17.

[7] BCH sent separate, individually addressed letters to Cabi, Cakir and Mert.  D. 33-1 at 57, 59, 61.  In all respects pertinent to this analysis, the text and substance of the letters are identical.

agrees with BCH's argument.  That position, however, does nothing to disrupt the enforceability of the promise BCH did make – the promise to pay salaries.

The language in the letters regarding finding alternative laboratory placements for Plaintiffs, however, is not binding because the language indicates only that BCH remained "hopeful" that it would be able to place Plaintiffs in another laboratory.  Here, BCH's argument in favor of dismissal more accurately reflects the relevant legal precedent.  As BCH notes, it is well established that "[e]xpectations . . . fall far short of a binding agreement." Brighton Packing Co. v. Butchers' Slaughtering & Melting Ass'n, 211 Mass. 398, 405 (1912).  "[I]t is essential to the existence of a contract that its nature and the extent of its obligations be certain." Backman v. Smirnov, 751 F. Supp. 2d 304, 312 (D. Mass. 2010) (quoting Caggiano v. Marchegiano, 327 Mass. 574, 579 (1951)).  BCH's statement regarding laboratory placement reflects a mere "'expectation[] . . .' that do[es] not manifest an intent to be bound." Lambert, 449 Mass. at 124 (2007); see Corkery v. Scofield, 69 Mass. App. Ct. 1114, 2007 WL 2230368, at *1 (2007) (finding no binding contract where the purported agreement "included no language indicating the parties' intent to be bound").  Because BCH's "hope[]" that it would be able to place Plaintiffs in another laboratory "does not [impose an] obligat[ion] . . . to do anything,"  it "lacks the mutuality of obligation necessary for adequate consideration." Malone v. Cemetery St. Dev., Inc., No. 94-cv-339-PJB, 1995 WL 85288, at *2 (D.N.H. Feb. 17, 1995) (granting motion to dismiss breach of contract claim where purported agreement was merely a memorandum of understanding); see Tharpe v. Cisco Sys., Inc., No. 07-cv-12279-RWZ, 2008 WL 687416, at *1-2 (D. Mass. Feb. 14, 2008) (granting motion to dismiss where statement upon which plaintiff relied was "too vague to create an enforceable contract" and "too indefinite to form an agreement binding upon the parties").  At bottom, "'[BCH's] well founded hope' is not enough to support reasonable

reliance."  <u>Fernandes v. The Talbots, Inc.</u>, No. 04-cv-3979-WIG, 2005 WL 1009749, at *2 (Mass. Super. Mar. 18, 2005) (granting motion to dismiss where statements upon which plaintiff based detrimental reliance claim were "simply too vague").  For all of these reasons, BCH's hope regarding lab placement cannot serve as the basis of this contract claim.

Thus, the only "agreement" upon which Plaintiffs attempt to rely that survives this motion to dismiss is BCH's promise to pay Cabi's and Mert's salaries and miscellaneous expenses in exchange for, *inter alia*, Plaintiffs' discretion regarding the ongoing investigations. As to this promise to pay salaries and expenses, Plaintiffs have also satisfied the other elements of a breach of contract claim.  Plaintiffs have sufficiently alleged that BCH breached the agreement:  Plaintiffs allege that BCH did not pay miscellaneous expenses.  D. 33 ¶ 192. Plaintiffs further allege that BCH's breach caused Plaintiffs to suffer damages, including harm to their publication and patent record, harm to their professional reputation and lost time.  <u>Id.</u> ¶¶ 211-230.  Thus, Plaintiffs have adequately pleaded a breach of contract claim against BCH.

### H.    Plaintiffs Have Adequately Stated Misrepresentation Claims against BCH (Count IX)

Plaintiffs assert false misrepresentation and negligent misrepresentation claims against BCH.  <u>Id.</u> ¶¶ 307-312.  Pursuant to Fed. R. Civ. P. 9(b), claims of fraud must be plead with particularity.  For pleading purposes, "misrepresentation is considered a species of fraud." <u>Alternative Sys. Concepts, Inc. v. Synopsys, Inc.</u>, 374 F.3d 23, 29 (1st Cir. 2004).  "[T]he pleader usually is expected to specify the who, what, where, and when of the allegedly false . . . representation."  <u>Id.</u>  Because courts are split on whether to apply the heightened pleading standard to claims of negligent misrepresentation,[8] out of an abundance of caution, the Court

---

[8] <u>See e.g.</u>, <u>AcBel Polytech, Inc. v. Fairchild Semiconductor Int'l, Inc.</u>, No. 13-cv-13046-DJC, 2014 WL 4656608, at *10 (D. Mass. Sept. 12, 2014) (noting that "there is a split in authority as

applies the heightened standard to Plaintiffs' claim of negligent misrepresentation as well as Plaintiffs' claim of intentional misrepresentation.   To state a claim of intentional misrepresentation, a plaintiff must allege that "the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his damage." Barrett Assoc., Inc. v. Aronson, 346 Mass. 150, 152 (1963).   Negligent misrepresentation requires the same elements, except that the defendant needs neither knowledge that the statement was false nor intent to deceive the plaintiff.   See Kitner v. CTW Transp., Inc., 53 Mass. App. Ct. 741, 749 (2002).

Plaintiffs have satisfied the heightened pleading requirement.   Plaintiffs allege that BCH management falsely assured them that BCH's non-retaliation policy would protect Plaintiffs if they reported Ozcan's misconduct.   Plaintiffs point specifically to the allegation that in March 2014, during a meeting in her office, Dianne McCarthy ("McCarthy"), the Chief Counsel for Research Affairs at BCH, informed Plaintiffs that Plaintiffs would not be damaged for reporting Ozcan's misconduct.   D. 33 ¶¶ 32, 41-42.   Plaintiffs also allege that in her office, in March 2014, McCarthy assured Plaintiffs that BCH would assign Plaintiffs an independent senior supervisor. Id. ¶ 43.   Contrary to BCH's argument otherwise, D. 45 at 33-34, these allegations satisfy the who, what, when and where pleading requirements for a misrepresentation claim.   Plaintiffs also pleaded that BCH breached its representations by failing to assign Plaintiffs to a new laboratory, cutting Plaintiffs off from research resources and terminating Plaintiffs' employment.   D.33 ¶¶

---

to whether Fed R. Civ. P. 9(b), which requires plaintiffs to plead some claims with particularity, even applies to claims for negligent misrepresentation under Massachusetts law"); Gardner v. Simpson Fin. Ltd. P'ship, No. 09-cv-11806-FDS, 2012 WL 1109104, at *4 n.12 (D. Mass. Mar. 30, 2012) (noting that "[i]t is unclear whether Rule 9(b) always applies to a claim of negligent misrepresentation").

166-193.  Plaintiffs' reliance on the allegedly false statements can be reasonably inferred from Plaintiffs' decision to seek the advice of multiple superiors at BCH before reporting Ozcan's misconduct.  <u>Id.</u> ¶¶ 30-32, 40-44.  Moreover, Plaintiffs pleaded that BCH made its false representations intentionally and for the purpose of inducing Plaintiffs to rely on the representations.  <u>Id.</u> ¶ 308.  Plaintiffs' allegations regarding the concerted efforts of BCH and Ozcan to block Plaintiffs from the revenue stream tied to the anti-obesity research "permit[s] the reasonable inference that [BCH] intentionally made th[e] false statements."  <u>Spinnato v. Goldman</u>, 67 F. Supp. 3d 457, 465 (D. Mass. 2014) (denying motion to dismiss misrepresentation claim where facts permitted inference of intentional misrepresentation).  Thus, granting all reasonable inferences to Plaintiffs, Plaintiffs have plausibly stated claims for negligent and intentional misrepresentation.  The motion to dismiss Plaintiffs' misrepresentation claims is denied.

## VI.   Amendment

Having considered each claim individually, the Court now turns to whether dismissal is with or without prejudice.  In the motion papers, Plaintiffs request an opportunity to amend on any claim the Court dismisses.  D. 46 at 19.  It is well established that courts "should freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  This liberal standard "typically applies even where a party requests leave to amend after a motion to dismiss has been fully briefed."  <u>U.S. ex rel. D'Agostino v. EV3, Inc.</u>, 802 F.3d 188, 195 (1st Cir. 2015). Therefore, where the Court has, in this opinion, dismissed a claim due to Plaintiffs' failure to plead sufficient allegations, the dismissal is granted without prejudice.

Defendants argue that leave to amend should be categorically denied because Plaintiffs have already amended their complaint once.  D. 62 at 11.  While the Court recognizes that any

further amendments will be Plaintiffs' third version of the complaint, Defendants have not pointed to either undue delay on the part of Plaintiffs or any prejudice further amendment will impose on Defendants.  See e.g., California ex rel. Wible v. Warner Chilcott PLC, No. 11-cv-11143-NMG, 2014 WL 1338285, at *2 (D. Mass. Apr. 1, 2014) (allowing leave to file third amended complaint where plaintiff "ha[d] not engaged in undue delay in seeking to amend after the defendants pointed out deficiencies in the [operative complaint]").  In the absence of prejudice and undue delay, the Court is compelled by the liberal standard in favor of allowing amendment.

Where, however, the Court has explained that it is dismissing a claim due to legal deficiencies or the presence of factual allegations that render the claim legally untenable, amendment would be futile.  In those circumstances, the Court grants dismissal with prejudice. Gray v. Evercore Restructuring L.L.C., 544 F.3d 320, 327 (1st Cir. 2008) (affirming denial of amendment where "given what is already alleged in the second amended complaint . . .  any additional amendment would be futile").  For the sake of clarity in this complex action, the Court now summarizes its outcome on each claim.

## VII.   Conclusion

For the foregoing reasons, the Court DENIES in part and GRANTS in part Defendants' motions to dismiss, D. 38, 40, 44, in the following manner:

- On Count I and II (the section 1983 claims), as brought against BCH, Ozcan, Majzoub, Fenwick and Garvin, the Court DISMISSES WITH PREJUDICE.

- On Count III (the claims under Mass. Gen. L. c. 12 §11I), as brought against Fenwick and Garvin, the Court DISMISSES WITHOUT PREJUDICE; the Court

DENIES the motions to dismiss Count III in so far as the claims are brought against Ozcan, BCH and Majzoub.

- On Count IV (the hostile work environment claim under Title VII), the Court DENIES the motion to dismiss in so far as the claim is brought against BCH.

- On Count V (the hostile work environment claims under Mass. Gen. L. c. 151B), the Court DENIES the motions to dismiss in so far as the claims are brought against BCH and Ozcan.

- On Count VI (the various retaliation claims), the Court has separately addressed each of the statutes upon which Plaintiffs attempt to bring these claims:

  - To the extent the retaliation claims are brought pursuant to 42 U.S.C. § 289, 42 C.F.R. § 93, 42 U.S.C. § 1983 and Mass. Gen. L. c. 149 § 185, the Court DISMISSES WITH PREJUDICE Count VI as brought against BCH, Ozcan and Majzoub.

  - To the extent the retaliation claims are brought pursuant to 42 U.S.C. § 1981 and Mass. Gen. L. c. 151B, the Court DENIES the motions to dismiss Count VI in so far as the claims are brought against BCH, Ozcan and Majzoub.

  - To the extent the retaliation claims are brought pursuant to the anti-retaliation provision of Title VII, the Court DENIES the motion to dismiss Count VI as brought against BCH; to the extent the claims are brought under the anti-retaliation provision of Title VII, the Court DISMISSES WITH PREJUDICE Count VI as brought against Ozcan and Majzoub.

- On Count VII (conspiracy claims), as brought against Fenwick and Garvin, the Court DISMISSES WITHOUT PREJUDICE; the Court DENIES the motions to dismiss Count VII in so far as the claims are brought against BCH, Ozcan and Majzoub.

- On Count VIII (breach of contract claim), the Court has separately addressed each of the three legal theories upon which Plaintiffs attempt to bring this claim:

  o  To the extent the contract claim is based on the theory that BCH's promise to pay Cabi and Mert's salaries and expenses amounted to an enforceable contract, the Court DENIES the motion to dismiss in so far as the claim is brought against BCH.

  o  To the extent the contract claim is based on the theory that BCH's employer policies amounted to an enforceable contract, the Court DISMISSES WITHOUT PREJUDICE as against BCH.

  o  To the extent the contract claim is based on the theory that BCH's "hope[]" that it would be able to place Plaintiffs in a new laboratory amounted to an enforceable contract, the Court DISMISSES WITH PREJUDICE.

- On Count IX (the intentional and negligent misrepresentation claims), the Court DENIES the motion to dismiss in so far as the claims are brought against BCH.

To the extent Plaintiffs seek to amend the complaint on those claims that the Court dismisses without prejudice, Plaintiffs must file the amended complaint on or before February 26, 2016.

   **So Ordered.**

<u>/s/ Denise J. Casper</u>
United States District Judge